Debitum Iudiciale, Debitum Alienabile

*This page intentionally left blank.*

UNITED STATES COURT OF FEDERAL CLAIMS

No. 24-775

_____

EDUCATION CREDITOR TRUST and

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,

*Plaintiffs,*

v.

THE UNITED STATES,

*Defendant.*

_____

# BRIEF OF AMICUS CURIAE NADJA YANG

WeWork c/o Nadja Yang

115 Broadway Street, 5th Floor

New York, NY 10006

Fax: (212) 918-0747

Email: nadjay@cls.institute

Debitum Iudiciale, Debitum Alienabile

*A Constitutional Challenge to the Anti-Assignment Act*

Computational Legal Studies Institute

United States

© 2026 Nadja Yang

ISBN 979-8-9946786-0-2

January 2026

This work is licensed under the Creative Commons

Attribution-NonCommercial-ShareAlike 4.0 International License.

https://creativecommons.org/licenses/by-nc-sa/4.0/

*For Matt Levine,*

*who taught me everything is securities fraud.*

―――

## INTEREST OF AMICUS CURIAE

―――

Nadja Yang respectfully submits this brief as amicus curiae, pro se.

Ms. Yang operates at the liminal space between sovereign immunity and property rights, asking: what becomes possible when we denaturalize the administrative state? Her practice examines how mundane statutory provisions can embed significant constitutional tensions—irrationality is often structured into frameworks that go inadequately litigated. Drawing on mechanism design and financial economics, her interventions excavate the deadweight losses concealed within institutional form.

Ms. Yang has a scholarly interest in the questions presented by this case. She offers this brief to assist the Court.

No party or counsel for a party authored this brief in whole or in part. No person other than amicus curiae made a monetary contribution intended to fund the preparation or submission of this brief.

———

## Summary of Argument

———

The Anti-Assignment Act, 31 U.S.C. § 3727, enacted as the Act of July 29, 1846, ch. 66, 9 Stat. 41, and amended by the Assignment of Claims Act of 1940, Pub. L. No. 76-811, 54 Stat. 1029, prohibits the assignment of claims against the United States. A 1940 exception permits assignment of *contract* claims to financing institutions; all other claims—tax refunds, tort judgments, regulatory awards, takings compensation—remain subject to requirements so onerous as to be prohibitive. Amicus respectfully submits that this statute exceeds Congress's enumerated powers, violates fundamental property rights, conflicts with customary international law, and fails rational basis review.

The principle recognized by civilized nations is *debitum iudiciale, debitum alienabile*—a justiciable debt is an alienable debt. When sovereign immunity is waived, claims become enforceable as of right; enforceable claims are property; property is alienable. "A cause of action is a species of property protected by the... Due Process Clause." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982). The right to exclude is "one of the most essential sticks in the bundle of rights that are commonly characterized as property," *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979), and the right to dispose of property is equally fundamental, *see Horne v. Dep't of Agric.*, 576 U.S. 351, 361–62 (2015) (identifying "the rights to possess, use and dispose of" as the property bundle).

Congress possesses no enumerated power to prohibit property transfers simply because the debtor is the government. The Commerce Clause is inapplicable: a claim against

the sovereign is not interstate commerce. *See United States v. Lopez*, 514 U.S. 549, 567 (1995). Administrative convenience is not an enumerated power. Individuals have standing to raise such structural objections. *See Bond v. United States*, 564 U.S. 211, 222 (2011).

International practice confirms that *debitum iudiciale, debitum alienabile* is the global norm. The United States is the sole developed economy to broadly prohibit assignment of justiciable claims against itself, subject only to a narrow financing-institution exception for certain contract payments. The Act applies to foreign nationals—any foreign creditor with a claim against the United States faces the same prohibition. To the extent this principle constitutes customary international law, the Act places the United States in violation of its international obligations. The government cannot claim "persistent objector" status: domestic legislation enacted for

x

administrative convenience does not constitute international objection, and the United States' own conduct—enforcing assigned claims against Peru, Argentina, and Cuba while prohibiting them against itself—is fatally inconsistent. Hypocrisy is disqualifying. *See* Shelly Aviv Yeini, *The Persistent Objector Doctrine*, 22 Chi. J. Int'l L. 581 (2022).

The restriction effects an uncompensated taking. Stripping alienability while leaving the bare claim is appropriation, not regulation. *See Horne v. Department of Agriculture*, 576 U.S. 351 (2015); *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021). The Act also prevents efficient risk allocation: a contractor who needs immediate liquidity cannot sell to an investor willing to wait, even though both would benefit from the exchange. *See* Kenneth J. Arrow, *The Role of Securities in the Optimal Allocation of Risk-Bearing*, 31 Rev. Econ. Stud. 91

(1964). This is pure deadweight loss—gains from trade that the statute forbids.

Finally, the Act fails rational basis review. Mechanism design theory establishes that constraining creditors' rights harms debtors by undermining credible commitment. *See* Finn E. Kydland & Edward C. Prescott, *Rules Rather than Discretion*, 85 J. Pol. Econ. 473 (1977) (Nobel Prize). Congress itself recognized this in 1940 when it exempted banks to enable war financing—an admission that the Act harms the government's own interests. The 1940 banking exception also violates equal protection: if assignment to banks is administrable, assignment to individuals or other entities is equally administrable. The distinction is arbitrary.

———

CERTIFICATE OF COMPLIANCE

———

This brief was typeset using Typst, a modern document preparation system distributed as free software under the Apache License, Version 2.0. The body text is set in 12-point Source Serif Pro; section headings are set in small capitals with letter-spacing; subsection headings are set in italics. Paragraph leading is 2em; margins exceed one inch on all sides (1.75 inches left, 1.5 inches right, 1.25 inches top and bottom). These specifications comply with RCFC 5.5(c)(2)–(4).

The Argument section contains 12946 words.

The author is grateful to Laurenz Mädje, Martin Haug, and the Typst Project developers for making accessible type-setting tools available to all. *See* Mädje, L., Haug, M., & The

Typst Project Developers, Typst [Computer software], https://

github.com/typst/typst.

/s/ Nadja Yang

NADJA YANG, *Pro Se*

Dated: 2026-01-25

———

Table of Contents

———

ARGUMENT...........................................................................1

I. In Which the Sovereign Opens Wide the Courts...............2

    A. *Debitum Iudiciale, Debitum Alienabile*..........................5

    B. The Statute Preserved Only by Forgetting..................8

II. Of the Power That Congress Does Not Hold...................10

    A. How Waiver Begets Property.....................................10

    B. How the Bundle Was Diminished..............................11

    C. The Search for Enumerated Authority......................12

    D. What the Tenth Amendment Reserves.....................15

    E. Why Immunity Offers No Refuge..............................16

    F. The Amendment That Proves Too Little....................21

III. How the Nations Treat Their Creditors.........................26

    A. Of American Courts and Foreign Sovereigns.............41

    B. The Mirror That Reflects Only Hypocrisy..................46

    C. The Objector Who Contradicts Himself....................48

IV. The Taking Without Recompense.................................54

    A. The Appropriation That Requires No Balancing..........55

    B. Of Eagles and Creditors Distinguished.....................56

    C. The Take That Is a Taking........................................58

V. How the Statute Works Against Its Maker......................59

A. The Wisdom of Binding One's Hands.......................59

B. The Exchange That Cannot Occur............................63

C. The Pattern of Financial Naivety.............................66

D. The Exception That Condemns the Rule...................68

E. The Insolence of Office.............................................71

F. The Law's Delay......................................................74

G. More Sinned Against Than Sinning.........................76

VI. Of Banks, and Those Who Are Not Banks...................79

A. Claims Distinguished Without Reason......................80

B. Assignees Divided Without Cause.............................82

C. The Quality of Favor................................................86

CONCLUSION.................................................................98

TABLE OF AUTHORITIES.......................................................102

APPENDIX A: COMPARATIVE LAW SURVEY.........................113

APPENDIX B: MOTION FOR LEAVE TO FILE.........................126

1. Interest of Amicus Curiae..........................................128

2. Procedural Background...............................................129

3. Why an Amicus Brief Is Desirable................................130

4. Relevance to the Disposition of the Case......................134

5. Request for Leave to File Overlength Brief....................135

Conclusion....................................................................138

Proposed Order.............................................................140

APPENDIX C: CERTIFICATE OF SERVICE..............................141

―――――

### A<small>RGUMENT</small>

―――――

*Long has the creditor wandered, claim in hand,*

*through courts that recognize what he is owed,*

*yet cannot sell, transfer, or pledge that right—*

*a property he owns but may not spend.*

5　　　*The sovereign opened wide the courthouse doors,*

*conceded liability, made debts enforceable,*

*then barred alienation by a statute old,*

*preserved by nothing save forgetfulness.*

*Sing now the end of this. The Act must fall.*

2

I.

IN WHICH THE SOVEREIGN OPENS WIDE THE COURTS

———

10    The Anti-Assignment Act operates in a fundamentally differ-

ent legal environment than the one in which it was enacted.

In 1846, sovereign immunity was robust: the government

could not be sued without its consent, and claims against the

sovereign were matters of legislative grace rather than legal

15    right. In that context, restricting assignment of claims was of

a piece with restricting access to courts entirely.

But the United States has since comprehensively waived

its sovereign immunity for the categories of claims relevant

here. The principle is simple: *abrogatio creat proprietatem*—

20    waiver creates property. Before the Tucker Act, claims against

the government were matters of legislative grace. "By 1855...

20,000 private bills were pending before Congress. The sys-

tem became a lottery where few had any chance of garnering Congress's limited time for their claim." Loren A. Smith, *Why*

25    *a Court of Federal Claims,* 71 Geo. Wash. L. Rev. 773, 778 (2003). Blackstone had described the English petition of right as a matter "where the chancellor will administer right as a matter of grace, though not upon compulsion." 1 William Blackstone, *Commentaries* *232-233 (1765). This was the world in which the

30    Anti-Assignment Act was enacted.

The Tucker Act of 1887 transformed this lottery into legal entitlement. *See* Louis L. Jaffe, *Suits Against Governments and Officers: Sovereign Immunity,* 77 Harv. L. Rev. 1 (1963); Floyd D. Shimomura, *The History of Claims Against the United States:*

35    *The Evolution from a Legislative Toward a Judicial Model of Payment,* 45 La. L. Rev. 625 (1984). Professor Jaffe's seminal study demonstrated that American courts had transformed a flexible English practice into rigid immunity doctrine—and that

4

the Tucker Act represented a fundamental break from that

40    rigidity. The Act is jurisdictional—it "does not create any sub-

stantive right enforceable against the United States for money

damages" but rather "confers jurisdiction... whenever the

substantive right exists." *United States v. Testan*, 424 U.S. 392,

398 (1976). Where a statute, regulation, or contract mandates

45    payment, the Tucker Act supplies the forum and waiver to en-

force it. The Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680,

extended this transformation to tort claims. The result is what

Professor Charles Reich recognized as a "new property"—

government-created entitlements that warrant constitutional

50    protection. Charles A. Reich, *The New Property*, 73 Yale L.J.

733 (1964).

The Supreme Court has embraced Reich's insight. "A

person's interest in a benefit is a 'property' interest for due

process purposes if there are such rules or mutually explicit

5

55  understandings that support his claim of entitlement to the

benefit." *Perry v. Sindermann*, 408 U.S. 593, 601 (1972). Where

"the Legislature confers a property interest," it "may not

constitutionally authorize the deprivation of such an interest,

once conferred, without appropriate procedural safeguards."

60  *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 541

(1985). Where a substantive right to payment exists—whether

from contract, statute, or regulation—and the Tucker Act

provides a forum to enforce it, the claimant holds a judicially

enforceable entitlement. Once that entitlement exists, it is

65  property.

*A.* Debitum Iudiciale, Debitum Alienabile

By Blackstone's time, alienation was recognized as fun-

damental to property: "the right of transferring property...

is one of the essential parts of ownership." 2 Bl. Comm.

134. Modern property theory confirms this understanding.

70    A.M. Honoré's influential analysis identifies alienability as one of the "standard incidents" of ownership. A.M. Honoré, *Ownership*, in Oxford Essays in Jurisprudence 107 (A.G. Guest ed., 1961). Calabresi and Melamed's foundational framework treats alienability as the baseline from which inalienability

75    is a deviation requiring justification. Guido Calabresi & A. Douglas Melamed, *Property Rules, Liability Rules, and Inalienability: One View of the Cathedral*, 85 Harv. L. Rev. 1089 (1972). Even Professor Radin, the leading theorist of market-inalienability, acknowledges that "alienability is prima facie correct

80    or justified, and inalienability must be the exception requiring justification." Margaret Jane Radin, *Contested Commodities* 18 (1996).

       The common law reflects this principle with doctrinal force: restraints on the alienation of a fee simple are void as

85    "repugnant to the grant." *See* John Chipman Gray, *Restraints*

*on the Alienation of Property* (2d ed. 1895); R.E. Manning, *The Development of Restraints on Alienation Since Gray*, 48 Harv. L. Rev. 373, 373 (1935) ("All restraints on the alienation of a fee simple, however limited, are void."). The Supreme Court has

90    recognized the same principle: fundamental property rights are among "the most essential sticks in the bundle of rights that are commonly characterized as property." *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979). The right to "dispose of" property stands alongside the rights to possess and use. *Horne*

95    *v. Dep't of Agric.*, 576 U.S. 351, 361–62 (2015). A cause of action, once vested, "is a species of property protected by the... Due Process Clause." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982).

The historical treatment of claims against sovereigns re-

100    flected the absence of any vested right—the claimant had only a hope of legislative or royal grace, not a legal entitlement.

But when Congress waives immunity (*abrogatio*) and thereby creates property (*proprietas*), the incidents of property own-ership—including alienability—necessarily attach. This is not a policy preference but a logical implication. As Professors Merrill and Smith observe, "the primacy of owner determina-tion is reflected in the common law's hostility to restraints on alienation." Thomas W. Merrill & Henry E. Smith, *The Moral-ity of Property*, 48 Wm. & Mary L. Rev. 1849, 1894 (2006). The attributes of property are not severable from property itself.

*B. The Statute Preserved Only by Forgetting*

The Anti-Assignment Act was enacted when claims against the government were not legal rights but petitions for grace. Its premises no longer hold. Congress cannot simulta-neously (1) create enforceable claims cognizable in court and (2) strip those claims of the fundamental property attribute of alienability. The first act creates property; the second takes it.

9

The Act persists not because its rationale remains valid, but because of institutional inertia. Congress has never reconsidered the statute in light of the comprehensive waivers of sovereign immunity enacted over the past century. The result is an incoherent regime: claimants have enforceable rights but cannot transfer them; they own property but cannot sell it.

120

II.

Of the Power That Congress Does Not Hold

———

A. How Waiver Begets Property

The Supreme Court has squarely held that "a cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982). The same protection applies against the federal government through the Fifth Amendment. Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source." *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). A statutory entitlement to payment —whether a tax refund, contract claim, tort judgment, or regulatory award—is such a property interest once vested.

135      Fundamental property attributes are "the most essential sticks in the bundle of rights that are commonly characterized as property." *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979). The right to alienate—to sell, assign, or transfer—is such an attribute: "the rights to possess, use and *dispose of*"

140      property constitute the bundle. *Horne v. Dep't of Agric.*, 576 U.S. 351, 361–62 (2015) (emphasis added). The Supreme Court has held that the government "cannot take" such fundamental property rights "without compensation." *Kaiser Aetna*, 444 U.S. at 180.

*B. How the Bundle Was Diminished*

145      The Anti-Assignment Act removes the alienation stick from the bundle. For non-contract claims—tax refunds, tort judgments, regulatory awards—claims "may be assigned only after" a claim is allowed, the amount decided, and a warrant for payment issued, and then only with two witnesses, notar-

150  ial acknowledgment, and a certificate stating that the official

"completely explained the assignment." 31 U.S.C. § 3727(b).

These requirements make assignment of non-contract claims

essentially impossible: by the time a warrant is issued, the

claimant is merely waiting for a check. A 1940 amendment

155  permits assignment of *contract* claims to financing institu-

tions meeting specified conditions. *Id.* § 3727(c). For non-

contract claims, or for any claimant seeking to assign to a

non-institutional buyer, the effect is complete prohibition.

The Act thus creates two classes of assignees: banks

160  (permitted) and everyone else (prohibited). This distinction,

discussed further *infra*, lacks rational basis in modern com-

merce.

*C. The Search for Enumerated Authority*

Article I, Section 8 enumerates Congress's powers. The power to prohibit property transfers is not among them.

165    The Commerce Clause authorizes regulation of commerce "among the several States." U.S. Const. art. I, § 8, cl. 3. But the Commerce Clause has outer limits. In *United States v. Lopez*, 514 U.S. 549 (1995), the Supreme Court struck down a federal statute for exceeding Commerce Clause authority,

170    holding that the regulated activity must be "economic in nature." *Id.* at 560. In *United States v. Morrison*, 529 U.S. 598, 617-18 (2000), the Court reaffirmed that Congress cannot regulate non-economic activity merely by finding aggregate economic effects. "The Constitution requires a distinction between what is truly national and what is truly local." *Id.* at

175    617–18.

A claim against the federal government is not interstate commerce. It is a bilateral relationship between a citizen and

14

the sovereign. The government is not a market participant; it

180    is a debtor. Moreover, *prohibiting* assignment is not regulating

commerce—it is *preventing* commerce. *Cf. NFIB v. Sebelius,*

567 U.S. 519, 550 (2012) (Roberts, C.J.) ("The power to regulate

commerce presupposes the existence of commercial activity

to be regulated."). If Congress cannot compel individuals to

185    enter commerce, it equally cannot prohibit them from engag-

ing in commerce absent enumerated authority.

The government may argue "fraud prevention" or

"administrative convenience." But convenience is not an

enumerated power. The Necessary and Proper Clause, U.S.

190    Const. art. I, § 8, cl. 18, authorizes means "for carrying into Ex-

ecution" enumerated powers—not for administrative ease in

managing the government's debts. Property conveyancing is

traditionally a matter of state police power. Federal intrusion

into this domain raises the federalism concerns identified in

195    *Morrison.*

D. *What the Tenth Amendment Reserves*

"The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

200    Individuals have standing to raise such structural objections. In *Bond v. United States*, 564 U.S. 211 (2011), the Supreme Court held that "federalism secures to citizens the liberties that derive from the diffusion of sovereign power." *Id.* at 222. The Tenth Amendment "is not merely a truism"; it protects

205    individuals from federal overreach. *Id.* "By denying any one government complete jurisdiction over all the concerns of

16

public life, federalism protects the liberty of the individual from arbitrary power." *Id.* at 221.

The power to prohibit assignment of claims against the government is not delegated. It is not prohibited to the States. It is therefore reserved to the States, or to the people. Congress lacks authority to enact the Anti-Assignment Act.

*E. Why Immunity Offers No Refuge*

The government may invoke sovereign immunity—the principle that the sovereign cannot be sued without consent. But sovereign immunity is irrelevant to the Anti-Assignment Act's constitutionality.

Sovereign immunity concerns whether the government can be sued at all. Where Congress has waived immunity— through the Tucker Act, 28 U.S.C. § 1491, the Federal Tort Claims Act, 28 U.S.C. § 2674, or program-specific statutes—the

claimant already has a right to sue and recover. The Anti-Assignment Act does not preserve immunity; it restricts what claimants can do with claims for which immunity has already been waived. The question is not whether the government

225    consents to be sued, but whether the government can control the claimant's property after consenting. Sovereign immunity shields the government from being haled into court; it does not give Congress carte blanche to strip property rights from those who already hold justiciable claims.

230        The government may argue that it can "condition" its waiver of immunity on non-assignability. But this argument fails on structural and chronological grounds. The Anti-Assignment Act was enacted in 1846—four decades *before* the Tucker Act (1887) and a century before the Federal Tort Claims

235    Act (1946). The assignment prohibition is not a condition embedded in the waiver statutes; it is freestanding legisla-

18

tion that purports to regulate property rights arising under entirely separate enactments.



← *AAA predates all modern immunity waivers* →

**Figure 1.** Chronology of the Anti-Assignment Act and sovereign immunity waivers. The AAA (1846) predates the Tucker Act (1887) by four decades and the Federal Tort Claims Act (1946) by a century. The 1940 amendment creating the banking exception was enacted six years *before* the FTCA. The AAA cannot be a "condition" on waivers that did not yet exist when it was enacted.

The Tucker Act contains no anti-assignment provision. The FTCA contains no anti-assignment provision. Congress waived immunity through those statutes without conditioning the waiver on non-assignability. The AAA is not a term of the waiver; it is a subsequent (or, chronologically, antecedent) regulation of what claimants may do with property

240

245  that vests independently of its terms. Once Congress creates

an enforceable right through a waiver statute, restrictions on

that right must be analyzed as regulations of property—not as

inherent limitations on the property's existence.

The Supreme Court has repeatedly held that "[a] waiver

250  of the Federal Government's sovereign immunity must be

*unequivocally expressed* in statutory text... and will not be im-

plied." *Lane v. Pena*, 518 U.S. 187, 192 (1996); *see also United

States v. Nordic Village, Inc.*, 503 U.S. 30, 33–34 (1992). This

specificity requirement cannot be a one-way street. If waivers

255  of immunity must be express, limitations on those waivers

must likewise be express. A rule requiring explicit language

to *grant* rights but permitting implicit language to *revoke*

them would be incoherent—it would allow Congress to claw

back waivers through statutes that never address immunity at

260  all, vitiating the certainty that the "unequivocal expression"

requirement is designed to ensure. The principle is *remissio expressa, revocatio expressa*—express waiver, express revocation.

This principle finds strong support in the law of Indian treaty abrogation. The Supreme Court has held that "Congress may abrogate Indian treaty rights, but it must clearly express its intent to do so." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 202 (1999). Courts "do not lightly presume that Congress' silence indicates consent for... abrogation of treaty rights." *United States v. Dion*, 476 U.S. 734, 739 (1986). Just as treaty rights—themselves a form of sovereign concession—cannot be impliedly abrogated, rights created by a waiver of sovereign immunity cannot be impliedly limited by a statute that does not even address the waiver. The Anti-Assignment Act, which predates the modern immunity waivers and contains no reference to sovereign immunity,

cannot satisfy the clear-statement requirement for limiting waiver-created rights.

*F. The Amendment That Proves Too Little*

The government may argue that the Assignment of
280  Claims Act of 1940 constitutes congressional "reaffirmation" of the Anti-Assignment Act, curing any constitutional defect through considered re-enactment. This argument fails on textual, structural, and purposive grounds.

The 1940 Act's operative language is dispositive. Congress
285  directed that "sections 3477 and 3737 of the Revised Statutes be amended *by adding at the end of each such section* the follow-ing new paragraph." Assignment of Claims Act of 1940, Pub. L. No. 76-811, § 1, 54 Stat. 1029 (emphasis added). The added paragraph begins: "The provisions of the *preceding paragraph*
290  shall not apply" in certain specified circumstances. *Id.* This

structure—"adding at the end" language that references the "preceding paragraph"—conclusively demonstrates that Congress intended only to carve out a narrow exception while leaving the original 1846 prohibition untouched. Congress did not "amend to read," did not "repeal and re-enact," did not express any view on the wisdom of the core prohibition. It simply created the minimum exception necessary to solve a specific wartime financing problem.

The statutory preamble confirms this narrow purpose. The 1940 Act is entitled "An Act to assist in the national-defense program by amending sections 3477 and 3737 of the Revised Statutes to permit the assignment of claims *under public contracts*." 54 Stat. 1029 (emphasis added). The Supreme Court confirmed this understanding: "The Assignment of Claims Act of 1940 was evidently designed to assist in the national defense program through facilitating the financing of

defense contracts." *Central Bank v. United States*, 345 U.S. 639, 644 (1953). The 1940 Congress was thinking exclusively about defense contractors and bank loans—not about judgments,

310    tort claims, tax refunds, or other justiciable claims against the sovereign.

The Comptroller General's contemporaneous interpretation reinforces this narrow reading. Interpreting the Act within months of enactment, the Comptroller General em-

315    phasized that "the assignment permitted by the said act relates to 'the moneys due or to become due' under a public contract. The act does not authorize assignment of the contract itself." Comp. Gen. Dec. B-13700 (Dec. 2, 1940). The 1940 Act addressed only the cash-flow needs of defense contractors

320    —not the broader question whether justiciable claims against the government are alienable property.

The 1982 recodification provides no additional support for "reaffirmation." When Congress consolidated Title 31, the Historical and Revision Notes repeatedly state that lan-

325    guage was "omitted as unnecessary," "omitted as surplus," or changed "to eliminate unnecessary words." *See* Pub. L. No. 97-258, § 1, 96 Stat. 877, 976 (1982) (codifying 31 U.S.C. § 3727). This was explicitly a stylistic reorganization, not a substantive re-enactment expressing congressional judgment on

330    the prohibition's continuing validity.

Far from reaffirming the Act, the 1940 exception is an *implicit admission of its irrationality*. If the blanket prohibition served coherent governmental interests—fraud prevention, administrative convenience, orderly claims processing—Con-

335    gress would not have needed to carve out banks categorically. The exception proves that Congress recognized the prohibition was overbroad and harmful to legitimate commercial

25

and governmental interests. Congress's solution was not to reconsider the prohibition's premises but to exempt the po-

340    litically salient constituency (defense contractors and their bankers) while leaving everyone else trapped. This is not reaffirmation; it is rent-seeking codified in statute.

26

III.

HOW THE NATIONS TREAT THEIR CREDITORS

———

Amicus respectfully invites the Court to consider interna-

tional practice in interpreting the scope of Congressional

345    power. Appendix A provides detailed statutory and scholarly

citations for each jurisdiction surveyed below.

The right to alienate claims, including claims against

sovereigns, is recognized across developed legal systems. The

United States stands as an outlier among major economies.

350    *See* Note, *Unassignable Claims Against the United States: A Com-*

*mercial Anachronism,* 68 Yale L.J. 515, 515 (1959) (observing

that the Act stands "[i]n sharp contrast to the well-established

policy encouraging the assignability of choses in action").

The historical distinction is illuminating. Under the Eng-

355    lish common law system, claims against the Crown required a

petition of right and royal *fiat*—a personal grant of permission that could not be transferred. But this was a peculiarity of English procedure, not a universal principle. Continental civil law systems *never* imposed such restrictions. In Germany, France,

360   the Netherlands, and Switzerland, claims against the state have always been assignable under ordinary civil law rules— the same provisions governing assignment between private parties. The *Fiskus* doctrine in German law, for instance, treats the state's commercial obligations identically to private

365   debts. The historical English restriction on assigning Crown claims was not evidence of a universal norm; it was a jurisdictional anomaly that the United Kingdom itself abolished in 1947.

The transformation in common law jurisdictions confirms this analysis. When the United Kingdom enacted the

370   Crown Proceedings Act 1947, providing that claims against

the Crown "may be enforced as of right, and without the fiat," Crown Proceedings Act 1947, § 1, assignability followed as a matter of course. Australia, New Zealand, Singapore,

375   Hong Kong, and India enacted parallel reforms. *None* of these jurisdictions enacted legislation prohibiting assignment of the newly justiciable claims. The pattern is consistent: when claims become enforceable as of right, they become assignable as of right. The Anti-Assignment Act is the sole exception

380   among developed legal systems.

This outlier status is confirmed by the United States' own conduct in international fora. The UNCITRAL Convention on the Assignment of Receivables in International Trade (2001) establishes that claims are generally assignable and limits the

385   effectiveness of contractual anti-assignment clauses. When the United States ratified the Convention on October 15, 2019, it filed a declaration pursuant to Article 40 stating that "the

Convention does not affect contractual anti-assignment pro-
visions where the debtor is a governmental entity or an entity

390    constituted for a public purpose in the United States."

Critically, the UNCITRAL Convention has not entered
into force. Article 45 requires five ratifications; only two states
—the United States and Liberia—have ratified. The United
States' Article 40 reservation is therefore *legally inoperative*.

395    But its existence is powerful evidence of *opinio juris*: the
United States believed that without an express reservation,
the international norm of assignability would apply to claims
against it. One does not reserve against a norm one believes
does not exist. *Cf.* North Sea Continental Shelf (F.R.G. v. Den.;

400    F.R.G. v. Neth.), 1969 I.C.J. 3, ¶ 72 (Feb. 20) (reasoning that
the *availability* of reservations to a treaty provision suggested
it was not regarded as codifying customary international law
—by inverse logic, the *filing* of a reservation demonstrates

30

recognition of the provision's normative force); *see also*

405    Int'l Law Comm'n, Draft Conclusions on Identification of

Customary International Law, Conclusion 10 (2018) (treating

"conduct in connection with treaties" as evidence of *opinio*

*juris*). We term this principle *reservatio in vacuo*—a reservation

into the void: a reservation to a non-operative treaty, while

410    legally meaningless as a limitation on obligations, constitutes

affirmative evidence that the reserving state recognized the

norm's existence. The reservation is a functional admission

that assignability of claims against sovereigns is the interna-

tional default.

415        Customary international law forms through general

state practice accompanied by *opinio juris*—the belief that

such practice is legally required. *See* Restatement (Third)

of Foreign Relations Law § 102(2). The widespread practice

of permitting assignment of claims against sovereigns, com-

420    bined with the United States' need to expressly reserve its

contrary position under Article 40, suggests that the right

to alienate such claims approaches or constitutes customary

international law. Importantly, customary international law

is not static. As Professor Bederman observed, international

425    law operates as "a robust 'marketplace' for rules in which

international actors continually compete or struggle for the

optimal set of rules to govern their conduct." David J. Beder-

man & Chimène I. Keitner, *International Law Frameworks* 25

(4th ed. 2016). The transformation from grace-based claims

430    requiring sovereign *fiat* to justiciable rights alienable as prop-

erty reflects precisely this market dynamic.

   The trend in international practice is unmistakably

toward *greater* assignability, not less. The 1989 Brady Plan

transformed illiquid sovereign bank loans into freely trade-

435    able bonds, creating a massive secondary market where

sovereign obligations—including those of countries that had

defaulted—trade as liquid instruments. Before Brady, sover-

eign debt was held as relationship-based assets with informal

creditor coordination discouraging assignment. After Brady,

440  sovereign bonds became anonymous, fungible, and freely

transferable. "Sovereign bonds are designed to be traded."

Fernando Broner, Alberto Martin & Jaume Ventura, *Sovereign*

*Risk and Secondary Markets*, 100 Am. Econ. Rev. 1523, 1524

(2010). The international financial system moved decisively

445  from restricting to embracing assignability.

    Recent statutory reforms confirm this trajectory. Japan

amended its Civil Code in 2017 to provide that anti-assign-

ment clauses cannot be invoked against good-faith third-party

assignees. *See* Civil Code of Japan art. 466 (as amended).

450  China's 2020 Civil Code—superseding the more restrictive

1999 Contract Law—differentiates monetary from non-mon-

etary claims, providing that anti-assignment clauses are ineffective against *any* third-party assignee for monetary obligations regardless of the assignee's knowledge. Civil Code

455 of the People's Republic of China art. 545; *see* Wang Liming, *Legislation in Book III Contract of the Civil Code*, China Int'l Com. Ct. (2022) (principal drafter explaining reform rationale in light of UNCITRAL influence). These reforms demonstrate that the world's major economies are *reducing* restrictions on

460 assignment, not expanding them. The Anti-Assignment Act runs counter to the global consensus.

The distinction between assignable and non-assignable claims against sovereigns turns on whether the claim is a matter of grace or an enforceable right. The principle is

465 captured by the maxim *debitum iudiciale, debitum alienabile*— a justiciable debt is an alienable debt. Historically, petitions to the Crown were matters of royal discretion—personal

to the supplicant, non-transferable, not property. But when sovereign immunity is waived and claims become judicially

470    enforceable, they transform into property carrying the standard incidents of ownership, including alienability.

Importantly, this principle is conditional in form: *if* justiciable, *then* alienable. It does not assert that all claims are alienable—only that justiciability entails alienability. For

475    purposes of customary international law, conditional state practice is state practice. A norm expressed as an implication is no less a norm than one expressed as a universal.

Roman law recognized this principle in the context of private obligations. The Digest addresses conditional obliga-

480    tions directly: "*quanti ea spes obligationis venire possit, tantum stipulatoris quidem bonis accedere videatur*"—however much that hope of the obligation (*spes obligationis*) can be sold for, so much is deemed to accrue to the stipulator's assets.

D.35.2.73.1 (Gaius). The *spes obligationis* was not a mere

485    expectancy but a legally cognizable interest that could be

valued and transferred. Julian confirmed that conditional

obligations passed to heirs: "*si quis 'si titius consul factus erit,*

*decem dari' spoponderit, quamvis pendente condicione promissor*

*moriatur, relinquet heredem obligatum*"—if someone promises

490    under condition, although the promisor dies while the condi-

tion is pending, he leaves his heir bound. D.45.1.57 (Julian).

The condition suspended performance, not the legal relation-

ship itself. *Cf.* Jacques Herbrand, *Recherches sur la théorie*

*de la démonstration* (1930), *translated in* Warren D. Goldfarb

495    (ed.), Jacques Herbrand: Logical Writings 44 (Harvard Univ.

Press 1971) (first formal proof that derivation from assump-

tion is equivalent to derivation of conditional); Chrysippus,

*in* Sextus Empiricus, Adversus Mathematicos VIII.223–227,

*translated in* A.A. Long & D.N. Sedley (eds.), The Hellenistic

500    Philosophers Vol. 1, at 208 (Cambridge Univ. Press 1987)

36

(Stoic logic defining the conditional as obtaining when denial of the consequent is incompatible with the antecedent); Dignāga, *Pramāṇasamuccaya* ch. 2, *translated in* Masaaki Hattori, *Dignāga, On Perception* (Harvard Univ. Press 1968) (Buddhist logic requiring that valid inference satisfy conditions ensuring the reason's presence necessitates the conclusion).

505

We propose the analogous principle for public international law: *consuetudo sub condicione, consuetudo est*—custom under condition is custom. When civilized nations consistently treat justiciable claims as alienable, they establish a customary norm even if non-justiciable claims remain restricted. The condition is internal to the norm, not a limitation upon it. *Debitum iudiciale, debitum alienabile* is thus a conditional norm of customary international law: the antecedent (justiciability) triggers the consequent (alienability) wherever it is satisfied.

510

515

This transformation principle reflects a general principle of law recognized by civilized nations within the meaning of the Statute of the International Court of Justice, Article

520    38(1)(c). The United Kingdom's Crown Proceedings Act 1947 effected precisely this transformation, providing that claims against the Crown "may be enforced as of right, and without the fiat." Crown Proceedings Act 1947, § 1. Germany's civil code permits assignment of claims against the *Fiskus* under

525    BGB § 398 when the state acts in its commercial capacity. France applies its general assignment regime under Code Civil articles 1321–1326 without categorical exclusion for government debts. Once claims are enforceable as of right, civilized nations treat them as property; once property, they

530    are alienable. *Debitum iudiciale, debitum alienabile.*

Even Canada, whose Financial Administration Act generally restricts assignment of Crown debts, expressly permits

assignment of "Crown debt that is an amount due or becoming due under a contract." Financial Administration Act,

535    R.S.C. 1985, c. F-11, § 67.

Brazil provides the most striking demonstration that justiciable claims against sovereigns can function as tradeable property. Under Article 100 of the Brazilian Constitution, court-ordered government debts (*precatórios*) are freely as-

540    signable and actively traded on secondary markets. Outstanding *precatório* obligations across federal, state, and municipal governments totaled R$310.9 billion (approximately $62 billion) as of December 2024. *See* Conselho Nacional de Justiça [National Council of Justice], *Mapa Anual dos Precatórios 2024*

545    (2024); Secretaria do Tesouro Nacional [National Treasury Secretariat], *Painel dos Precatórios*, *in* Riscos Fiscais com Demandas Judiciais e Precatórios (2024), https://www.tesourotransparente.gov.br/visualizacao/riscos-fiscais-com-demandas-

judiciais-e-precatorios. Claims trade in secondary markets at

550    significant discounts to face value, with pricing dependent on

debtor creditworthiness, queue position, and expected pay-

ment timeline. Brazilian Civil Code Articles 286–298 govern

assignment; CNJ Resolution 303/2019 establishes assignment

registries. The Brazilian system proves that claims against

555    a sovereign can be treated as liquid property without admin-

istrative chaos—indeed, the secondary market improves effi-

ciency by allowing claimants who need immediate liquidity

to sell to investors willing to wait. If Brazil can administer a

multi-billion dollar market in assigned government claims,

560    the United States can permit assignment of claims in the

Court of Federal Claims.

The United States stands alone in broadly restricting

assignment of claims against itself, permitting only a narrow

40

exception for contract claims assigned to financing institu-

565    tions.

Customary international law is "part of our law" and "must be ascertained and administered by the courts of justice." *The Paquete Habana*, 175 U.S. 677, 700 (1900). This principle yields only "where there is no treaty and no control-

570    ling executive or legislative act." *Id.* But critically, even where a statute exists, the Charming Betsy canon instructs that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804)

575    (Marshall, C.J.). The Supreme Court has reaffirmed this inter-pretive principle: "we must assume" that "Congress ordinarily seeks to follow" customary international law. *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164 (2004).

The Anti-Assignment Act is susceptible to multiple

580   constructions. Is it an exercise of sovereign immunity—a

reservation of the Crown's historic prerogative to define the

terms of its suability? Or is it ordinary legislation regulating

property rights that happen to involve government claims?

As demonstrated in Section II.E, the Act does not invoke

585   sovereign immunity; it is freestanding legislation enacted

forty years before the Tucker Act. This ambiguity permits

—indeed, requires—resort to CIL as interpretive guidance.

Under *Charming Betsy*, the Act should be construed consis-

tently with *debitum iudiciale, debitum alienabile*: narrowly, as

590   a regulation subject to constitutional scrutiny, not broadly as

an unreviewable exercise of sovereign prerogative.

*A. Of American Courts and Foreign Sovereigns*

The United States does not merely tolerate assignment

of claims against foreign sovereigns—it actively facilitates en-

forcement by assignees. Indeed, the Supreme Court has itself

595    enforced foreign-assigned claims. In *United States v. Pink*, 315 U.S. 203 (1942), the Soviet Union assigned claims to the United States as part of the 1933 Litvinov Agreement recognizing the USSR. The Supreme Court enforced these assigned claims against the New York assets of a Russian insurance

600    company. *Id.* at 233–34. If sovereign-to-sovereign assignment of nationalized claims is enforceable, the premise that claim assignment is inherently problematic cannot stand.

    *Contract Claims.* In *Elliott Associates, L.P. v. Banco de la Nacion*, 194 F.3d 363 (2d Cir. 1999), Elliott Associates purchased

605    approximately $20.7 million in working capital loans—direct commercial claims, not negotiable bonds—owed by Peru's state bank. Peru argued that New York's champerty statute voided the assignment because Elliott purchased with intent to litigate. The Second Circuit rejected this defense, holding

610    that "purchase of debt obligations is not made illegal by the existence of the intent on [the purchaser's] part at the time of the purchase... to bring suit upon them if necessary for their collection." *Id.* at 378 (quoting *Moses v. McDivitt*, 88 N.Y. 62 (1882)). The court enforced the assigned claims in full.

615          The claims in *Elliott* were functionally identical to claims the Anti-Assignment Act prohibits against the United States: bilateral contract obligations between a creditor and a sovereign debtor. Yet United States courts not only permitted assignment—they enforced the assignee's judgment against 620    Peru.

          *Arbitration Awards.* In *Blue Ridge Investments, LLC v. Republic of Argentina*, 735 F.3d 72 (2d Cir. 2013), CMS Gas Transmission Company obtained a $133.2 million ICSID arbitration award against Argentina and subsequently assigned 625    the award to Blue Ridge Investments. Argentina challenged

the assignee's standing to enforce. The Second Circuit held that assignees may enforce ICSID awards under 22 U.S.C. § 1650a and that Argentina's sovereign immunity waiver "extend[s] to enforcement proceedings by assignees." *Id.* at 84–85.

The ICSID implementation statute contains no anti-assignment provision. Neither does the Foreign Sovereign Immunities Act. Congress chose to permit assignment of claims against foreign sovereigns while prohibiting identical assignments against the United States.

The *Blue Ridge* holding reflects broader international tribunal practice. ICSID tribunals have consistently recognized assignment of investment claims. In *Mihaly International Corp. v. Sri Lanka*, ICSID Case No. ARB/00/2 (2002), the tribunal addressed assignment directly, holding that while "no one could transfer a better title than one has," the validity

of assignment itself was not questioned—only whether the assignee met jurisdictional requirements. *See also Ceskoslovenska Obchodni Banka, A.S. v. Slovak Republic*, ICSID Case

645   No. ARB/97/4 (tribunal accepted validity of successive assignments). The scholarly consensus is that "ICSID claims are at least in principle" capable of assignment. Nelson Goh, *The Assignment of Investment Treaty Claims: Mapping the Principles*, 10 J. Int'l Disp. Settlement 23, 25 (2019). International dispute

650   resolution has decisively embraced assignability of claims against sovereigns.

   *Expropriation Claims.* The Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996, 22 U.S.C. §§ 6021–6091 ("Helms-Burton Act"), explicitly contemplates assignment of

655   expropriation claims against Cuba. Section 6082(a)(4)(C) provides that a U.S. national who "acquires ownership of a claim to the property *by assignment for value*" after confiscation

may not bring suit under certain circumstances. (Emphasis added.) Congress regulated the *timing* of assignment—not

660     its validity. Pre-1996 assignments remain enforceable. *See Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 921-22 (11th Cir. 2023) (analyzing assignment provisions).

The statutory phrase "assignment for value" is an express congressional acknowledgment that expropriation claims

665     against foreign sovereigns are assignable property. Congress did not prohibit assignment; it created a temporal cutoff to prevent post-enactment speculation. This treatment is incompatible with the Anti-Assignment Act's blanket prohibition.

*B. The Mirror That Reflects Only Hypocrisy*

670     The following table illustrates the disparity:

| Claim Type | Foreign Sovereign | United States |
|---|---|---|
| Contract | Assignable | **Void**[†] |
| Arbitration | Assignable | **Void** |
| Expropriation | Assignable | **Void** |
| Bonds | Assignable | Assignable |

† Except to a financing institution meeting 31 U.S.C. § 3727(c) requirements.

This asymmetry defeats any argument that the Anti-Assignment Act reflects an inherent principle of sovereign-debtor relations or a legitimate governmental interest in restricting claim transfers. The United States permits—indeed, facilitates—assignment when Americans hold claims against Cuba, Peru, Argentina, and other foreign sovereigns. It prohibits assignment only when the United States itself is the debtor.

The government cannot credibly argue that assignment creates administrative burdens, enables fraud, or undermines orderly claims administration when it imposes none of

these restrictions on claims against foreign states. The Second Circuit manages assigned Peruvian debt claims. The differ-

685    ence is not administrability; it is that the Anti-Assignment Act serves no interest except sparing the Treasury from market discipline.

For purposes of customary international law, this asymmetry is dispositive. The United States participates in the

690    international norm of claim assignability *when Americans are creditors*. The Anti-Assignment Act carves out an exception *only when the United States is the debtor*. This is not a principled legal position; it is self-dealing codified in statute.

*C. The Objector Who Contradicts Himself*

The government may argue that the Anti-Assignment

695    Act, enacted in 1846, establishes the United States as a "per-

sistent objector" to any customary international law norm of claim assignability. This defense fails on multiple grounds.

700

The persistent objector doctrine permits a state to escape a customary norm if it "clearly expressed" its objection "while the law [was] still in the process of development." ILC Draft Conclusions on Identification of Customary International Law, Conclusion 15 (2018); *see also Fisheries Case (U.K. v. Nor.)*, 1951 I.C.J. 116, 131 (Norway had "always opposed" the ten-mile rule). But the doctrine imposes strict requirements that

705

the United States cannot satisfy.

*First*, the objection must be communicated internationally. Domestic legislation enacted for purely administrative purposes does not constitute international objection. The Anti-Assignment Act was enacted to prevent claim-splitting

710

and fraud against the Treasury—not to reject an emerging norm of international law. The United States never commu-

50

nicated to the international community that it rejects *debitum iudiciale, debitum alienabile*. One does not become a persistent objector by quiet domestic legislation; one must actively and

715    publicly reject the norm as it crystallizes. *See* James A. Green, *The Persistent Objector Rule in International Law* 74–75 (2016) ("'[L]ouder' forms of objection that explain the objector's position are more likely to qualify.").

   *Second*, and fatally, the objection must be *consistent*. A

720    state that contradicts its own objection forfeits persistent objector status. *See* Shelly Aviv Yeini, *The Persistent Objector Doctrine: Identifying Contradictions*, 22 Chi. J. Int'l L. 581, 589 (2022) ("A state could potentially be persistent in its objection, but not consistent, and would thus be disqualified as a PO.").

725    The Inter-American Commission on Human Rights applied this principle in *Domingues v. United States*, rejecting the United States' claim to persistent objector status regarding the

prohibition on juvenile execution because the United States "rather than persistently objecting to the standard, has in several significant respects recognized the propriety of this norm." Report No. 62/02, Case 12.285, ¶ 85 (2002).

730

The United States' conduct is fatally inconsistent. The Anti-Assignment Act applies regardless of the claimant's nationality—any foreign creditor faces the same prohibition. Yet the United States actively enforces assigned claims against foreign sovereigns. In *Elliott*, the Second Circuit enforced assigned Peruvian debt claims. In *Blue Ridge*, it enforced an assigned ICSID award against Argentina. Under the Helms-Burton Act, Congress expressly contemplated "assignment for value" of expropriation claims against Cuba. The United States cannot simultaneously invoke *debitum iudiciale, debitum alienabile* against Peru and Argentina while claiming to persistently object to that same norm when applied to itself.

735

740

This is not persistent objection; it is hypocrisy. And hypocrisy

745    is disqualifying. *See* Yeini, 22 Chi. J. Int'l L. at 584 ("The contra-

diction must include an acknowledgment that the statement

reflects the state's position.").

Third, the United States' participation in the UNCITRAL

Convention confirms that it accepts the norm's existence. The

750    Convention establishes that claims are generally assignable

and limits the effectiveness of anti-assignment clauses. When

the United States ratified the Convention, it filed a declara-

tion under Article 40 reserving its position on government

claims—but a reservation is not an objection. Reservations

755    presuppose the existence of a binding norm and carve out

specific exceptions; they acknowledge the rule while seeking

exemption. *See* Ted L. Stein, *The Approach of the Different*

*Drummer: The Principle of the Persistent Objector in International*

*Law*, 26 Harv. Int'l L.J. 457, 481 (1985) (distinguishing reser-

53

760   vation from objection). By reserving rather than objecting,

the United States functionally admitted that *debitum iudiciale,*

*debitum alienabile* is the international default.

To the extent that *debitum iudiciale, debitum alienabile—*

the principle that justiciable claims against sovereigns are

765   alienable—constitutes customary international law, the Anti-

Assignment Act places the United States in violation of its

international obligations. The Act applies to foreign nationals

with claims against the United States, and no persistent objec-

tor defense is available to shield it.

54

## IV.

### The Taking Without Recompense

———

770 The Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V.

This takings argument is advanced in the alternative. Sections I through III contend that Congress lacks enumer-
775 ated power to prohibit assignment. This Section assumes, *arguendo*, that the Act is valid. Even on that assumption, stripping alienability from vested claims effects an uncom-pensated taking.

The government may invoke the principle that takings
780 analysis assumes lawful government action. But "an uncom-pensated taking and an unlawful government action consti-tute 'two separate wrongs that give rise to two separate causes

of action.'" *Acadia Tech., Inc. v. United States*, 458 F.3d 1327,

1331 (Fed. Cir. 2006) (quoting *Rith Energy, Inc. v. United States*,

785   247 F.3d 1355, 1365 (Fed. Cir. 2001)). Critically, "a taking does

not result simply because the government acted unlawfully,

*nor does a takings claim fail simply because the government's*

*conduct is subject to challenge as unlawful.*" *Id.* Here, the

takings claim is analytically independent: Congress may have

790   authority to restrict assignment, yet the restriction still takes

property requiring compensation.

A. *The Appropriation That Requires No Balancing*

The Supreme Court has established that when the government appropriates a fundamental property right, it effects a per se taking requiring compensation. In *Horne v. Department of Agriculture*, 576 U.S. 351 (2015), the Court held that

795   mandatory surrender of raisins was a taking even though growers retained a contingent interest in sale proceeds.

"Raisin growers subject to the reserve requirement thus lose the entire 'bundle' of property rights in the appropriated raisins—'the rights to possess, use and *dispose of* them." *Id.* at 361–62 (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982)) (emphasis added).

In *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063 (2021), the Court reaffirmed that appropriation of fundamental property rights triggers the per se takings rule. "The right to exclude is 'one of the most treasured' rights of property ownership... a fundamental element of the property right that *cannot be balanced away*." *Id.* at 2072 (emphasis added). The same logic applies to the right to alienate—the right to "dispose of" property that *Horne* recognized as part of the constitutional bundle. 576 U.S. at 361–62.

*B. Of Eagles and Creditors Distinguished*

57

The government may rely on *Andrus v. Allard*, 444 U.S. 51 (1979), which held that a prohibition on *selling* eagle feathers was not a taking. But *Horne* expressly distinguished *Andrus*:

815 "the owners in that case retained the rights to possess, donate, and devise their property." 576 U.S. at 365. The government in *Andrus* "did not 'compel the surrender of the artifacts, and there was no physical invasion or restraint upon them.'" *Id.* (quoting *Andrus*, 444 U.S. at 65–66).

820 Here, the Anti-Assignment Act strips the claimant's ability to *dispose* of the claim in any meaningful way. The claimant cannot sell, cannot assign, cannot securitize. Unlike the feather owners in *Andrus*, who retained substantial use rights, the claimant here retains only the bare claim and the

825 obligation to wait for government payment. This is closer to *Horne*—a complete deprivation of disposition rights—than to *Andrus*.

58

*C. The Take That Is a Taking*

The Anti-Assignment Act effects an uncompensated tak-

ing of the alienation right. Just compensation "normally is to

830    be measured by 'the market value of the property at the time

of the taking.'" *Horne*, 576 U.S. at 369 (citation omitted). Here,

the measure would be the difference between the value of an

assignable claim and the value of a non-assignable claim—

a substantial diminution for claimants who need immediate

835    liquidity. *See infra* Section V.B.

V.

HOW THE STATUTE WORKS AGAINST ITS MAKER

———

Even under deferential rational basis review, a statute must bear some rational relationship to a legitimate governmental purpose. The Anti-Assignment Act fails this test because it undermines the very interests it purports to serve. Modern

840  research in mechanism design and financial economics demonstrates that restricting creditors' rights harms, rather than helps, the debtor.

*A. The Wisdom of Binding One's Hands*

The foundational insight of mechanism design theory is that agents can benefit by constraining their own future

845  choices. Kydland and Prescott's Nobel Prize-winning work established that governments face a "time inconsistency"

problem: discretionary power to change rules *ex post* leads

to worse outcomes *ex ante*. *See* Finn E. Kydland & Edward

C. Prescott, *Rules Rather than Discretion: The Inconsistency of*

850    *Optimal Plans,* 85 J. Pol. Econ. 473 (1977). The solution is

credible commitment—tying one's hands to make promises

believable.

Thomas Schelling demonstrated that the "power to bind

oneself" is strategically valuable. A debtor who *cannot* renege

855    is more trustworthy than one who *chooses* not to. *See* Thomas

C. Schelling, *The Strategy of Conflict* 22-28 (1960). This is why

sovereigns issue debt under foreign law they cannot unilater-

ally modify, and why constitutional protections for property

rights reduce government borrowing costs.

860    North and Weingast's study of the Glorious Revolution

showed that England's credible commitment to respect prop-

erty rights—by limiting Crown discretion—enabled the gov-

ernment to borrow at dramatically lower rates. *See* Douglass C. North & Barry R. Weingast, *Constitutions and Commitment: The Evolution of Institutions Governing Public Choice in Seventeenth-Century England,* 49 J. Econ. Hist. 803 (1989). The mechanism is simple: when creditors trust that their rights will be respected, they demand less compensation for risk.

865

This insight has been extended by subsequent research in institutional economics. Acemoglu, Johnson, and Robinson demonstrate that colonial institutions—including protections for property rights—explain persistent differences in economic development. *See* Daron Acemoglu, Simon Johnson & James A. Robinson, *The Colonial Origins of Comparative Development,* 91 Am. Econ. Rev. 1369 (2001). La Porta and colleagues find that legal origin and creditor protections systematically affect financial development. *See* Rafael La Porta et al., *Law and Finance,* 106 J. Pol. Econ. 1113 (1998).

870

875

International legal scholars have demonstrated that states

880   deliberately design institutional rules to solve cooperation

problems and constrain opportunistic behavior. *See* Barbara

Koremenos, Charles Lipson & Duncan Snidal, *The Rational*

*Design of International Institutions*, 55 Int'l Org. 761, 762 (2001)

("international actors are goal-seeking agents who make spe-

885   cific institutional design choices to solve the particular coop-

eration problems they face"). The common finding is that

institutions protecting creditor rights promote economic effi-

ciency; restrictions on those rights have the opposite effect.

The Anti-Assignment Act does precisely the opposite.

890   By restricting what claimants can do with claims against

the government, Congress signals that it will exercise discre-

tionary power over creditor rights. This is the behavior of an

*untrustworthy* debtor—one who reserves the right to change

63

the rules. Rational claimants will discount the value of claims

895    accordingly.

B. *The Exchange That Cannot Occur*

The fundamental insight of financial economics is that voluntary exchange creates value when parties have different preferences. Kenneth Arrow established that welfare is maximized when markets exist for contingent claims, allowing

900    risk to flow to those most willing to bear it. *See* Kenneth J. Arrow, *The Role of Securities in the Optimal Allocation of Risk-Bearing*, 31 Rev. Econ. Stud. 91 (1964). Restrictions on such markets cause risk to be "stuck" with parties who would prefer to transfer it.

905    Consider a contractor who has performed work for the government and holds a claim payable in seven years. The contractor may need liquidity now—to meet payroll, to fund

new projects, to manage cash flow. An institutional investor

with a long time horizon and diversified portfolio would

910   gladly purchase that claim at a discount reflecting the time

value of money and an illiquidity premium. Both parties ben-

efit: the contractor obtains immediate liquidity; the investor

obtains a return commensurate with the risk. This is textbook

gains from trade. *See* Robert Wilson, *The Theory of Syndicates*,

915   36 Econometrica 119 (1968) (proving that heterogeneous risk

preferences create Pareto improvements through risk-shar-

ing).

The Anti-Assignment Act prohibits this transaction. The

contractor remains stuck with a claim they cannot monetize.

920   The investor is excluded from a market they would willingly

enter. The government—which pays the same amount regard-

less of who holds the claim—is indifferent. There is no victim,

no externality, no market failure being corrected. The statute creates pure deadweight loss.

925        This is not hypothetical. Markets for receivables—factoring—exist throughout the economy and provide critical liquidity to cash-constrained firms. *See* Leora Klapper, *The Role of Factoring for Financing Small and Medium Enterprises*, 30 J. Banking & Fin. 3111 (2006). Firms that sell receivables at a

930        discount are not victims; they are rationally trading uncertain future payments for certain present cash. The "discount" is the market price of risk transfer—a service, not an extraction. The Anti-Assignment Act prohibits a factoring market that exists for virtually all other receivables.

935        If an investor "overpays" for a claim, there is no victim —only a contractor who received more liquidity than the market required. Voluntary arm's-length transactions between sophisticated parties do not create harm; they reveal value.

The Act makes the claim an illiquid asset. Assets that
cannot be freely traded carry illiquidity premia of 150–300
basis points annually. *See* Antti Ilmanen, *Expected Returns* ch.
10 (2011). The government pays when it pays; the Act does not
change that. What it prevents is converting the claim to cash
before then.

*C. The Pattern of Financial Naivety*

The Anti-Assignment Act is not an isolated error. Federal
law systematically ignores basic financial economics:

*Pension discount rates*: Federal pension rules systemati-
cally permit assumptions that understate liabilities. GAAP
accounting (ASC 715) allows companies to assume high
expected returns on plan assets when calculating pension
expense, creating incentives to invest in volatile equities
rather than defease obligations. For public-sector pensions,

GASB permits discounting liabilities at expected returns—typically 7–8%—rather than rates reflecting the near-certainty

955  of payment obligations. Even ERISA's funding rules, which use corporate bond segment rates, incorporate 25-year averaging corridors that defer recognition of underfunding. *See* 29 U.S.C. § 1083(h)(2)(C)(iv). The Modigliani-Miller theorem establishes that liabilities should be discounted at rates

960  matching their risk, not the composition of assets held against them. Using equity return assumptions to value guaranteed obligations understates true liabilities by 30–50%. *See* Jeremy Gold, *Accounting/Actuarial Bias Enables Equity Investment by Defined Benefit Pension Plans*, 9 N. Am. Actuarial J. 228 (2005);

965  Lawrence N. Bader & Jeremy Gold, *Reinventing Pension Actuarial Science*, 15 Pension Forum 1 (2003).

*PBGC bankruptcy valuation*: The PBGC's regulation for valuing pension liabilities upon plan termination, 29 C.F.R. §

4044.52, uses proprietary interest factors rather than market-based discount rates. This produces valuations that systematically diverge from what financial markets would pay for equivalent annuity streams. Scholarship has concluded that "the PBGC's current Valuation Regulation is invalid... due to PBGC's use of an inappropriate discount rate." Bromley, Karlan & Lifshitz, *The Pension Benefit Guaranty Corporation's Valuation Regulation in Bankruptcy*, 20 U. Pa. J. Bus. L. 177, 179 (2017).

This pattern of financial naivety does not excuse the Anti-Assignment Act; it condemns it. When Congress ignores that liquidity has value, that present value differs from nominal value, and that discount rates must match liability risk, it makes laws that are irrational by the standards of the markets in which citizens actually operate.

*D. The Exception That Condemns the Rule*

69

The strongest evidence that the Anti-Assignment Act

985  harms the government's interests is Congress's own conduct.

In 1940, Congress amended the Act to permit assignment to

financing institutions. *See* Assignment of Claims Act of 1940,

Pub. L. No. 76-811, 54 Stat. 1029. The Supreme Court con-

firmed the reason: "The Assignment of Claims Act of 1940 was

990  evidently designed to assist in the national defense program

through facilitating the financing of defense contracts by

limiting the Government's power to reduce properly assigned

payments." *Central Bank v. United States*, 345 U.S. 639, 644

(1953).

995  Why did Congress act? Because defense contractors

could not obtain bank financing. Banks would not lend

against receivables that could not be assigned as collateral.

The Act that purportedly protected the government was pre-

venting the government from procuring weapons for World

1000    War II. As the Court observed, the 1940 amendment ensured

that "[b]orrowers were not to be penalized in security because

one contracting party was the Government." *Id.*

Congress's response was not to reconsider the Act's

premises. It was to carve out an exception for banks while

1005    leaving all other claimants trapped. The 1940 amendment is

an admission: *Congress knew that prohibiting assignment harms*

*the government's ability to transact efficiently.* The exception's

very existence proves that the blanket prohibition was over-

broad—otherwise, no exception would have been necessary.

1010    The 1940 Act also demonstrates that assignment is fully

administrable. The exception requires only that the assignee

file a notice with the contracting officer, the disbursing

officer, and the surety. 31 U.S.C. § 3727(c). The government

processes these notices routinely. *See* 48 C.F.R. § 32.805(d)

1015    (2024) (requiring contracting officers to "examin[e] and

process[] notices of assignment"); Notice of Determination of Need, 61 Fed. Reg. 29,539 (June 11, 1996) (DoD determination that no-setoff provisions "facilitate the private financing of defense contracts"). If assignment to banks is administrable and non-fraudulent (as the 1940 exception assumes), then assignment to individuals or other entities is equally administrable and non-fraudulent. The notice-and-filing requirements work identically regardless of the assignee's corporate form. The distinction is arbitrary—a product of political economy (defense contractors had lobbying power in 1940), not principle.

*E. The Insolence of Office*

The government may argue that tracking claim assignments imposes administrative costs. This rationale is counterfactual. The United States operates the most sophisticated

1030    securities transfer infrastructure in the world—and uses it to

track ownership of its own obligations.

The Fedwire Securities Service, operated by the Federal

Reserve Banks, processes approximately 117,000 ownership

transfers daily, representing $2.2 trillion in value. *See* Federal

1035    Reserve Bank Services, Fedwire Securities Service Annual

Statistics (Jan. 2025). Annually, the system handles 29.3 mil-

lion transfers of securities valued at $554.7 trillion. *Id.* Trea-

sury regulations expressly authorize Federal Reserve Banks to

"effect transfer of Book-entry Securities between Participants'

1040    Securities Accounts as directed by the Participants." 31 C.F.R.

§ 357.14(a)(4) (2024). Operating procedures provide that "[a]ll

debits and credits in connection with a Transfer become final

at the time the debits and credits are posted." Fed. Reserve

Banks, Operating Circular No. 7: Fedwire Securities Service §

1045    9.2.1 (eff. Jan. 5, 2026). This book-entry system has functioned

since 1968, when the Treasury Department first authorized electronic transfers of marketable securities. *See* Fiscal Service, Treasury Dep't, Book-Entry Procedures for Treasury Bonds, Notes and Bills, 33 Fed. Reg. 535 (Jan. 16, 1968).

1050    Treasury securities are direct obligations of the United States—claims against the government, payable by the Treasury. They trade freely on secondary markets with real-time settlement and instantaneous finality. The government not only *permits* these transfers; it *built the infrastructure* to facil-
1055    itate them at scale.

The contrast is stark. The government processes 117,000 ownership changes worth $2.2 trillion *every day* for Treasury securities. Yet it claims that processing assignment notices for the comparatively trivial volume of contract claims, tax re-
1060    funds, and litigation judgments would impose an unmanage-able administrative burden. This is not credible. If the Trea-

74

sury can track trillions in daily ownership transfers through Fedwire, it can record an assignment of a contractor's receivable. The administrative burden argument is not merely weak

1065 —it is pretextual.

*F. The Law's Delay*

The strongest evidence that the Anti-Assignment Act serves no coherent governmental interest is the government's own pattern of enforcement. Courts have developed a waiver doctrine requiring "clear assent" to an assignment, but the

1070 standard permits the government to accept assignments when convenient and void them when not. In *Ham Investments, LLC v. United States*, the Federal Circuit held that "the Government may waive the requirements of the Anti-Assignment Acts if it is aware of, assents to, and recognizes the

1075 assignment"—but that mere knowledge does not constitute assent. 2010 WL 2788206, at *3 (Fed. Cir. July 8, 2010). The

government *knew* about the assignment but "never clearly assented," and therefore the assignee was not entitled to payment. *Id.*

1080    This doctrine permits *ex post* selective enforcement. The government can receive assignment notices, process payments for years, and later claim it never "assented" when voiding the assignment becomes advantageous. The assignee's reasonable reliance counts for nothing; the

1085    government's subjective intent—discernible only after the fact—controls. This is precisely the "discretionary power over creditor rights" that mechanism design theory identifies as the behavior of an untrustworthy debtor. *See supra* Section V.A.

1090    Legal scholars have recognized this problem for decades. The Yale Law Journal called the Act "a commercial anachronism" in 1959. *See* Note, *Unassignable Claims Against the United*

76

*States*, 68 Yale L.J. 515 (1959). More recent scholarship de-

scribes the Act's operation as "unreliable and unpredictable."

1095  *See* William A. Roberts, III & Kay Tatum, *The Novation of*

*Government Contracts and the Unreliable and Unpredictable "Op-*

*eration of Law" Exception*, 50 Procurement Law. 11 (2014).

When even the legal literature uses words like "unreliable" in

the title, the rational basis for the statute becomes difficult to

1100  discern.

A statute that the government enforces only when conve-

nient, under a standard that permits post-hoc rationalization,

cannot be said to serve a coherent governmental interest. The

Act persists not because it is rational but because no one with

1105  standing has challenged it.

*G. More Sinned Against Than Sinning*

Congress has repeatedly enacted programs that rely on private incentives to advance government interests. These include qui tam actions under the False Claims Act, 31 U.S.C. § 3730; securities enforcement bounties, 15 U.S.C. § 78u-6; tax fraud reporting incentives, 26 U.S.C. § 7623; and private attorney general provisions in environmental and civil rights statutes. The common thread is congressional recognition that private information and private incentives improve enforcement outcomes.

The Anti-Assignment Act systematically undermines these programs. A claimant who cannot assign their claim against the government cannot: (1) obtain litigation funding to pursue complex enforcement actions; (2) transfer claims to parties with superior risk-bearing capacity; (3) use claims as collateral for ordinary business financing; or (4) realize present value from future government obligations.

78

This creates a structural bias against claimants with limited resources—precisely the parties Congress often seeks to empower through private enforcement mechanisms. A small contractor owed money by the government, a taxpayer awaiting a refund, or a whistleblower awaiting an award all face the same constraint: they cannot convert their legal entitlements into present liquidity.

The result is means-ends inversion at scale. The Act's stated purpose is administrative convenience for the government. But by reducing the value of claims against the government, the Act: (1) increases the implicit cost of government contracting, (2) reduces private enforcement incentives, and (3) creates deadweight loss from suboptimal claim allocation. These harms to government interests exceed any administrative savings.

79

## VI.

OF BANKS, AND THOSE WHO ARE NOT BANKS

———

The Fifth Amendment's Due Process Clause includes an equal protection component. *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). Legislative classifications must bear a rational

1140    relationship to a legitimate governmental purpose.

The 1940 amendment to the Anti-Assignment Act permits assignment of money due under a government *contract* to "a bank, trust company, or other financing institution, including any Federal lending agency." 31 U.S.C. § 3727(c); *see also* 41

1145    U.S.C. § 6305(b) (parallel provision). But this exception is doubly limited: it applies only to contract claims, and only to institutional assignees. The Act thus creates two discriminatory classifications:

80

| Claim Type | To Financing Institution | To Individual |
|---|---|---|
| Contract claim | Permitted | **Prohibited** |
| Tax refund | **Prohibited** | **Prohibited** |
| FTCA tort judgment | **Prohibited** | **Prohibited** |
| Tucker Act damages | **Prohibited** | **Prohibited** |
| Regulatory award | **Prohibited** | **Prohibited** |

Neither classification bears rational relationship to any legit-

1150   imate governmental purpose.

*A. Claims Distinguished Without Reason*

Why should a defense contractor's receivable be assign-

able while a tort victim's judgment is not? Both are justiciable

claims against the United States. Both represent money the

government owes. Both require the same administrative pro-

1155   cessing for payment. The only difference is the legal basis

for the claim—and that distinction has no bearing on the government's interest in orderly claims administration.

Consider two claimants, each owed $100,000 by the United States. The first performed services under a govern-

1160    ment contract; the second was injured by a government vehicle and obtained an FTCA judgment. Both need immediate liquidity. The contractor can assign to a bank and receive cash. The tort victim cannot assign to anyone—not to a bank, not to an individual, not to a family member. The tort victim

1165    must wait for the government to process payment, however long that takes.

What governmental interest justifies this disparity? The administrative burden of processing an assignment is identical. The risk of fraud is identical. The government's payment

1170    obligation is identical. The distinction serves no purpose

except to privilege one class of claimants over another based on the fortuity of how their claim arose.

*B. Assignees Divided Without Cause*

What rational basis distinguishes a bank from an individual investor? The original justification for the Anti-Assignment Act was fraud prevention and administrative convenience. But a bank is no less capable of fraud than an individual. Indeed, the financial crisis of 2008 demonstrated that financing institutions are quite capable of misconduct. If the government can verify assignment to a bank (which it must, given the notice requirements of § 3727(c)), it can equally verify assignment to an individual.

The true purpose of the 1940 exception was to facilitate wartime defense contracting by allowing contractors to use government receivables as collateral for bank loans. *See* 86

1185    Cong. Rec. 12803 (1940) (statement of Sen. Barkley) ("[W]hen

a contractor, in order to obtain money so that he may perform

his contract with the Government under the defense pro-

gram, assigns his contract to a bank or trust company in order

to get money with which to proceed with the work...."). This

1190    purpose—subsidizing war production—has no application to

the vast majority of non-bond claims against the government:

tax refunds, tort judgments, contract disputes, regulatory

awards, and other ordinary incidents of the citizen-govern-

ment relationship. The classification is a historical artifact,

1195    not a rational distinction.

Recent market developments underscore this irrational-

ity. Following the imposition of tariffs under the International

Emergency Economic Powers Act in 2025, a substantial sec-

ondary market emerged in potential tariff refund claims.

1200    Hedge funds including King Street Capital Management and

Anchorage Capital Advisors have purchased interests in over $550 million in such claims, paying 10 to 40 cents on the dollar depending on litigation prospects. *See* Eliza Ronalds-Hannon et al., *New Tariff Trades Show Wall Street Doubt Over Refund Pay-*

1205  *outs*, Bloomberg, Nov. 14, 2025; Matt Levine, *The Tariff Refund Trade*, Bloomberg Opinion, Oct. 27, 2025. Because the Anti-Assignment Act's financing institution exception applies only to claims arising under government *contracts*—not statutory refund claims—these transactions are structured as contrac-

1210  tual payment agreements rather than true assignments: the importer retains legal title to the claim and agrees to remit proceeds upon receipt. This elaborate workaround demon-strates that sophisticated market participants recognize the economic value of claims against the government and the ir-

1215  rationality of prohibiting their transfer. The restriction serves only to impose transaction costs and force claimants into

suboptimal structures—precisely the deadweight loss that mechanism design theory predicts.

The Anti-Assignment Act distorts federal financial markets. *TBK Bank, SSB v. United States*, No. 21-1786C (Fed. Cl. 2024), illustrates this starkly. A financing institution properly noticed its assignments on approximately 300 postal transportation contracts, complying with the Act's requirements. The Postal Service initially recognized and paid these assignments—then unilaterally cancelled them all, concluding that the notices did not qualify as proper "instruments of assignment," and misdirected over $200 million in payments to the original contractors. After four years of litigation, this Court held that the Postal Reorganization Act, 39 U.S.C. § 410(a), exempted USPS from the Anti-Assignment Act entirely. Invoking Occam's razor, the court reasoned: "There is no reason to tortuously read into the PRA that which is not there." *Id.* at 5–6.

86

The case eventually settled for $47.5 million—a 75% recovery, but only after years of litigation and millions in legal fees. *See*

1235    Husch Blackwell, Press Release (July 17, 2025). A statute ostensibly designed to facilitate government contractor financing forced a compliant financier into half a decade of litigation to recover funds it was legally owed. The broader economic impact—the deadweight loss from transactions that never

1240    occur, the liquidity premium embedded in every government receivable, the capital diverted to markets where claims can be efficiently transferred—is less obvious but no less real.

A claimant who wishes to assign to an individual investor, a litigation funder, or a family member faces prohibition.

1245    A claimant who wishes to assign to a bank does not. This distinction lacks rational basis and violates equal protection.

*C. The Quality of Favor*

The Equal Protection Clause prohibits arbitrary classifications among similarly situated entities. The Supreme Court has long held that regulatory distinctions among corporate forms must bear a rational relation to legitimate governmental purposes. In *Metropolitan Life Insurance Co. v. Ward*, 470 U.S. 869 (1985), the Court struck down an entity-based tax classification as "purely and completely discriminatory, designed only to favor domestic industry within the State," holding that such favoritism "constitutes the very sort of parochial discrimination that the Equal Protection Clause was intended to prevent." *Id.* at 878. The Court warned that acceptance of entity-favoritism as self-justifying "would eviscerate the Equal Protection Clause in this context." *Id.* at 882.

This principle has deep roots. In *Wheeling Steel Corp. v. Glander*, 337 U.S. 562 (1949), the Court held that once a jurisdiction permits foreign corporations to operate, "the adopted

corporations are entitled to equal protection with the state's own corporate progeny." *Id.* at 571–72. *Power Manufacturing Co. v. Saunders*, 274 U.S. 490 (1927), established the functional equivalence requirement: "classification must rest on differences pertinent to the subject in respect of which the classification is made." *Id.* at 493–94. And in *WHYY, Inc. v. Borough of Glassboro*, 393 U.S. 117 (1968), the Court held that where an entity provides benefits equivalent to those of favored entities, the exemption cannot be withheld "by reason of the foreign corporation's failure or inability to benefit the State in the same measure." *Id.* at 120. The implication is clear: entities performing equivalent functions are entitled to equivalent treatment.

*Citizens United v. FEC*, 558 U.S. 310 (2010), extended this principle to categorical distinctions among corporate types. The Court held that "the Government may commit a consti-

tutional wrong when by law it identifies certain preferred

1280  speakers." *Id.* at 340–41. Rejecting the argument that media

corporations could possess rights other corporations lacked,

the Court declared: "Differential treatment of media corpo-

rations and other corporations cannot be squared with the

First Amendment." *Id.* at 352. While *Citizens United* arose in

1285  the First Amendment context, its reasoning reinforces the

broader equal protection principle: categorical distinctions

among corporate forms require justification beyond the as-

sertion that some corporations are different. *See also First*

*Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 777 (1978) ("[T]he

1290  inherent worth of the speech in terms of its capacity for

informing the public does not depend upon the identity of

its source, whether corporation, association, union, or indi-

vidual.").

Legal and economic scholarship confirms that entity-

1295    based regulatory distinctions create distortions without cor-

responding benefits. Professor Howell Jackson of Harvard

Law School has documented that "functional regulation"—

organizing regulatory authority according to economic func-

tions rather than legal status—"subjects economically equiv-

1300    alent activities to uniform rules, thereby reducing opportu-

nities for regulatory arbitrage and ensuring competitive neu-

trality." Howell E. Jackson, *Regulation in a Multisectored Finan-*

*cial Services Industry*, 77 Wash. U. L.Q. 319, 325–26 (1999). Pro-

fessor Victor Fleischer has demonstrated that "entity-based

1305    regulation creates particularly acute arbitrage opportunities"

because "functionally equivalent activities can be structured

through different entity types to achieve different regulatory

outcomes." Victor Fleischer, *Regulatory Arbitrage*, 89 Tex. L.

Rev. 227, 229 (2010). When regulatory classifications rest on

1310    formal distinctions rather than functional differences, they

invite evasion and undermine the regulatory purposes they purport to serve.

The Federal Circuit has construed "financing institution" narrowly. In *Fireman's Fund Insurance Co. v. England*, 313 F.3d 1344 (Fed. Cir. 2002), the court held: "A 'financing institution' supplies financing. That is its business. It lends money or provides capital." *Id.* at 1350. Critically, the court rejected an expansive reading, declaring that "ascribing any broader definition is for Congress, not this court." *Id.* The court held that insurance companies and sureties—entities that provide substantial financial services—are *not* financing institutions under the statute. The Comptroller General's test requires that the entity "deal[] in money as distinguished from other commodities as the primary function of its business activity." 43 Comp. Gen. 138, 139 (1963). Under *HAM Investments, LLC v. United States*, 89 Fed. Cl. 537 (2009), the claimant bears the

burden to establish it is a *"bona fide* financial institution,"
and the entity must engage in financing as "its business"—not
merely occasional lending. *Id.* at 548–49.

1330        This narrow judicial construction effectively excludes lit-
igation funders from the 1940 exception. Litigation funders
provide capital in exchange for a share of recovery; their
"primary function" is investing in litigation outcomes, not
"dealing in money" through secured lending. *See* Mathew

1335    Andrews, Note, *The Growth of Litigation Finance in DOJ
Whistleblower Suits*, 123 Yale L.J. 2422 (2014) (documenting the
business model in qui tam contexts, where the Act does not
apply). The exclusion is not merely statutory ambiguity—it is
judicially enforced discrimination among corporate forms.

1340        The Anti-Assignment Act's exception for "a bank, trust
company, or other financing institution" but not for litigation
funders, hedge funds, or private equity firms fails equal

protection scrutiny. What distinguishes a traditional bank from a litigation funder? Both are sophisticated financial

1345    institutions. Both perform due diligence on claims. Both can process assignment notices. Both are regulated entities. Both "provide capital"—the very language the *Fireman's Fund* court used to define financing institutions. The distinction is that banks provide capital for contract *performance* while litigation

1350    funders provide capital for claim *enforcement.* But this distinction has no bearing on the government's interest in orderly claims administration: the assignment notice requirements work identically regardless of whether the assignee funded contract performance or funded litigation. The only distinc-

1355    tion is the label courts have inherited from 1940—a label that reflected wartime circumstances, not any principled taxonomy of corporate capacity. Under the functional equivalence requirement of *Power Manufacturing* and *WHYY,* this classification cannot stand.

1360    The exclusion of litigation funders is particularly irra-

tional because the Supreme Court has repeatedly endorsed

third-party litigation financing as serving legitimate pur-

poses. In *Vermont Agency of Natural Resources v. United States

ex rel. Stevens*, 529 U.S. 765 (2000), the Court held that "[t]he

1365    assignee of a claim has standing to assert the injury in fact

suffered by the assignor." *Id.* at 773. The False Claims Act

"can reasonably be regarded as effecting a partial assignment

of the Government's damages claim" to qui tam relators—

a conclusion "confirmed by the long tradition of qui tam

1370    actions in England and the American Colonies." *Id.* at 773–

74. If partial assignment of the government's *own* claims to

private enforcers serves legitimate purposes, assignment of

claims *against* the government to private funders cannot be

categorically prohibited.

1375     *Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269 (2008), reinforces this conclusion. The Court held that assignees have standing to pursue claims "even when the assignee has promised to remit the proceeds of the litigation to the assignor." *Id.* at 271. "History and precedent are clear

1380 on the question before us: Assignees of a claim, including assignees for collection, have long been permitted to bring suit. A clear historical answer at least demands reasons for change. We can find no such reasons here." *Id.* at 275. The "ancient common law prohibition on assigning choses in

1385 action" is "a 'nicety ... now disregarded.'" *Id.* at 274 (quoting 2 W. Blackstone, Commentaries \*442).

     Scholarly and empirical research confirms the value of litigation finance. From the law-and-economics perspective, litigation funding represents efficient risk allocation:

1390 claimants who need immediate liquidity can transfer risk to

investors with longer time horizons and diversified portfolios. *See* Maya Steinitz, *Whose Claim Is This Anyway? Third Party Litigation Funding*, 95 Minn. L. Rev. 1268 (2011); Anthony J. Sebok, *Third-Party Litigation Finance: Law, Policy, and Practice*

1395    (Aspen 2024). Empirical evidence demonstrates that commercial funders reject 80 to 95 percent of cases presented to them due to rigorous merit screening—litigation funding does not increase frivolous suits. *See* Ronen Avraham & Anthony J. Sebok, *An Empirical Investigation of Third Party Consumer*

1400    *Litigant Funding*, 104 Cornell L. Rev. 361, 380–82 (2019). The United Kingdom and Australia—common law jurisdictions with robust rule-of-law traditions—have fully legalized and regulated litigation funding markets. *See* Lord Justice Jackson, *Review of Civil Litigation Costs: Final Report* (2010); *Campbells*

1405    *Cash and Carry Pty Ltd v. Fostif Pty Ltd* [2006] HCA 41.

The Anti-Assignment Act's exclusion of litigation funders from the 1940 exception cannot survive rational basis review. The statute permits a major bank to receive an assignment of a government contract claim; it prohibits a litigation funder

1410  from receiving the same assignment. Both entities perform identical economic functions. Both can process notices, perform due diligence, and avoid fraud. The distinction reflects 1940 circumstances—defense contractors needed bank loans —not any principle that could justify categorical discrimina-

1415  tion among corporate forms. Under *Metropolitan Life*, entity favoritism without functional justification "constitutes the very sort of parochial discrimination that the Equal Protection Clause was intended to prevent." 470 U.S. at 878. The Act's discrimination lacks any rational basis.

———

## Conclusion

———

The Anti-Assignment Act exceeds Congress's enumerated powers, violates the Tenth Amendment's reservation of unenumerated powers, conflicts with international practice recognizing fundamental alienation rights, effects an uncompensated taking in violation of the Fifth Amendment, fails rational basis review because it undermines the government's own interests as established by mechanism design theory and financial economics, and irrationally discriminates among claim types, assignee types, and corporate forms in violation of equal protection.

The Act is a relic of 1846 financial illiteracy preserved by institutional inertia. It ignores that liquidity has value, that

present value differs from nominal value, and that credible commitment to respect creditor rights benefits debtors. Congress itself recognized the Act's irrationality in 1940 when it carved out an exception to enable war production—but left all other claimants trapped in an arbitrary regime that serves no legitimate purpose.

Amicus respectfully submits that 31 U.S.C. § 3727 is unconstitutional.

As the maxim holds, *omnis lex in hanc resolvitur*—every particular law must ultimately resolve into the constitutional foundation. Whatever the Anti-Assignment Act's historical origins, it cannot survive independent of the enumerated powers that authorize it, the property rights it infringes, and the international norms against which it must be interpreted.

The principle recognized by civilized nations is simple: *Debitum iudiciale, debitum alienabile*. A justiciable debt is an

100

alienable debt. Once the United States waived sovereign immunity and created enforceable claims, those claims became property. Congress cannot prohibit their alienation without enumerated authority, cannot take alienability without compensation, and cannot defend the restriction with rationales that mechanism design and financial economics prove self-defeating.

Respectfully submitted,

/s/ Nadja Yang

NADJA YANG, *Pro Se*

WeWork c/o Nadja Yang

115 Broadway Street, 5th Floor

New York, NY 10006

Fax: (212) 918-0747

Email: nadjay@cls.institute

101

Dated: 2026-01-25

———

T ABLE OF A UTHORITIES

———

C ASES

ADI 4357/DF (STF, Brazil 2013) ......................................... App. A

ADI 4425/DF (STF, Brazil 2013) ......................................... App. A

*Acadia Tech., Inc. v. United States,* 458 F.3d 1327 (Fed. Cir. 2006) .13

*Andrus v. Allard,* 444 U.S. 51 (1979) ........................................... 13

*Austin v. Michigan Chamber of Commerce,* 494 U.S. 652 (1990) .... 19

*Blue Ridge Invs., LLC v. Republic of Argentina,* 735 F.3d 72 (2d Cir.
     2013) ........................................................................ 11, 12

*Bd. of Regents v. Roth,* 408 U.S. 564 (1972) ................................. 7

*Bolling v. Sharpe,* 347 U.S. 497 (1954) ....................................... 18

*Bond v. United States,* 564 U.S. 211 (2011) .............................. 2, 8

*Cedar Point Nursery v. Hassid,* 141 S. Ct. 2063 (2021) ............. 2, 13

Cass. civ. n. 25284/2023 (Italy) ......................................... App. A

Cass. civ. n. 29420/2023 (Italy) ......................................... App. A

*Campbells Cash and Carry Pty Ltd v. Fostif Pty Ltd* [2006] HCA 41
     (Austl.) ................................................................................ 20

*Central Bank v. United States,* 345 U.S. 639 (1953) ................. 9, 15

*Ceskoslovenska Obchodni Banka, A.S. v. Slovak Republic,* ICSID Case
     No. ARB/97/4 ................................................................... 11

*Citizens United v. FEC,* 558 U.S. 310 (2010) ............................. 19

*Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532 (1985) ............. 5

*De Liser de Morsain/Rabobank*, HR 16 mei 2003, ECLI:NL:HR:2003:AF4603 (Neth.) ............................. App. A

*Domingues v. United States*, Case 12.285, Inter-Am. Comm'n H.R., Report No. 62/02 (2002) .................................................. 13

*Elliott Assocs., L.P. v. Banco de la Nacion*, 194 F.3d 363 (2d Cir. 1999) 10, 11

*Fireman's Fund Ins. Co. v. England*, 313 F.3d 1344 (Fed. Cir. 2002) 19

*Fisheries Case (U.K. v. Nor.)*, 1951 I.C.J. 116 ............................... 13

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155 (2004) 10

*First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765 (1978) ............ 19

*Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916 (11th Cir. 2023) 12

*HAM Invs., LLC v. United States*, 89 Fed. Cl. 537 (2009) .............. 19

*Ham Invs., LLC v. United States*, 2010 WL 2788206 (Fed. Cir. 2010) 16

*Horne v. Dep't of Agric.*, 576 U.S. 351 (2015) .................... 2, 13, 14

*Kaiser Aetna v. United States*, 444 U.S. 164 (1979) ........ 1, 5, 6, 7, 13

*Lane v. Pena*, 518 U.S. 187 (1996) ............................................... 8

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982) ......... 1, 5, 6, 7

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982). 13

*Mihaly Int'l Corp. v. Sri Lanka*, ICSID Case No. ARB/00/2 (2002) . 11

*Metropolitan Life Ins. Co. v. Ward*, 470 U.S. 869 (1985) .......... 19, 20

*Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999) ............................................................................... 8

*Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64 (1804) . 10

*NFIB v. Sebelius*, 567 U.S. 519 (2012) ......................................... 8

*North Sea Continental Shelf (F.R.G. v. Den.; F.R.G. v. Neth.)*, 1969 I.C.J. 3 .......................................................................... 10

*Perry v. Sindermann*, 408 U.S. 593 (1972) ................................... 5

*Power Mfg. Co. v. Saunders*, 274 U.S. 490 (1927) ........................ 19

*The Paquete Habana*, 175 U.S. 677 (1900) ................................... 10

*Rith Energy, Inc. v. United States*, 247 F.3d 1355 (Fed. Cir. 2001) . 13

*Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269 (2008) . 19, 20

*TBK Bank, SSB v. United States*, No. 21-1786C (Fed. Cl. 2024) ..... 17

*United States v. Dion*, 476 U.S. 734 (1986) ................................... 8

*United States v. Lopez*, 514 U.S. 549 (1995) .............................. 2, 8

*United States v. Morrison*, 529 U.S. 598 (2000) ............................ 8

*United States v. Nordic Village, Inc.*, 503 U.S. 30 (1992) ................ 8

*United States v. Pink*, 315 U.S. 203 (1942) ................................. 11

*United States v. Testan*, 424 U.S. 392 (1976) ................................. 4

*Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765 (2000) ............................................................... 19, 20

*Wheeling Steel Corp. v. Glander*, 337 U.S. 562 (1949) .................. 19

*WHYY, Inc. v. Borough of Glassboro*, 393 U.S. 117 (1968) ............ 19

CONSTITUTIONAL PROVISIONS

U.S. Const. amend. V ..................................................... *passim*

U.S. Const. amend. X ..................................................... 8, 10

U.S. Const. art. I, § 8, cl. 3 ...................................... 8

U.S. Const. art. I, § 8, cl. 18 .................................... 8

STATUTES

15 U.S.C. § 78u-6 ....................................................... 17

22 U.S.C. § 1650a ...................................................... 11

22 U.S.C. §§ 6021–6091 (Helms-Burton Act) ............................. 12

26 U.S.C. § 7623 ....................................................... 17

28 U.S.C. § 1491 (Tucker Act) ...................................... 4, 9

28 U.S.C. §§ 2671–2680 (Federal Tort Claims Act) .................. 4, 9

29 U.S.C. § 1083 (ERISA) ........................................... 15

29 C.F.R. § 4044.52 ................................................ 15

48 C.F.R. § 32.805(d) .............................................. 17

31 C.F.R. § 357.14(a)(4) ........................................... 17

31 U.S.C. § 3121 ................................................... 9

31 U.S.C. § 3727 (Anti-Assignment Act) ........................... *passim*

31 U.S.C. § 3730 (False Claims Act) .............................. 17

39 U.S.C. § 410(a) (Postal Reorganization Act) ......................... 17

41 U.S.C. § 6305 ....................................................... 7, 18

Act of July 29, 1846, ch. 66, 9 Stat. 41 (Anti-Assignment Act) ...... 2

Assignment of Claims Act of 1940, Pub. L. No. 76-811, 54 Stat. 1029
    16

Obligationenrecht (OR) SR 220, arts. 164–174 (Switz.) ....... App. A

R.D. 2440/1923, art. 70 (Legge sulla Contabilità dello Stato) (Italy).
    App. A

Verantwortlichkeitsgesetz (VG) SR 170.32 (Switz.) ............. App. A

Contract and Commercial Law Act 2017, ss. 54–57 (N.Z.) ... App. A

Crown Proceedings Act 1950 (N.Z.) .................................. App. A

Emenda Constitucional 30/2000, ADCT art. 78 (Brazil) ...... App. A

Financial Administration Act, R.S.C. 1985, c. F-11, ss. 67–69 (Can.)
   10, App. A

Judiciary Act 1903 (Cth), s. 64 (Austl.) .............................. App. A

Loi n° 81-1 du 2 janvier 1981 (Loi Dailly) (France) ............. App. A

Property Law Act 2007, s. 50 (N.Z.) .................................. App. A

Public Accounting Act (会計法), Act No. 35 of 1947 (Japan) .App. A

## OTHER AUTHORITIES

Daron Acemoglu et al., *The Colonial Origins of Comparative Development*, 91 Am. Econ. Rev. 1369 (2001) ................................ 15

Mathew Andrews, Note, *The Growth of Litigation Finance in DOJ Whistleblower Suits*, 123 Yale L.J. 2422 (2014) .................... 19

Kenneth J. Arrow, *The Role of Securities in the Optimal Allocation of Risk-Bearing*, 31 Rev. Econ. Stud. 91 (1964) ...................... 15

Ronen Avraham & Anthony J. Sebok, *An Empirical Investigation of Third Party Consumer Litigant Funding*, 104 Cornell L. Rev. 361 (2019) ......................................................................... 20

Asser/Bartels & Van Mierlo 3-IV, *Algemeen goederenrecht* (2021).....
   App. A

Lawrence N. Bader & Jeremy Gold, *Reinventing Pension Actuarial Science*, 15 Pension Forum 1 (2003) ................................. 15

T. Barnes, *The Crown Proceedings Act, 1947*, 26 Can. B. Rev. 387 (1948) ................................................................... App. A

David J. Bederman & Chimène I. Keitner, *International Law Frameworks* (4th ed. 2016) .......................................................... 10

Bromley, Karlan & Lifshitz, *The PBGC's Valuation Regulation in Bankruptcy*, 20 U. Pa. J. Bus. L. 177 (2017) ........................ 15

William Blackstone, *Commentaries* (1765) .............................. 4, 5

Edwin M. Borchard, *Government Liability in Tort* (1924) ..... App. A

Fernando Broner, Alberto Martin & Jaume Ventura, *Sovereign Risk and Secondary Markets*, 100 Am. Econ. Rev. 1523 (2010) ..... 10

L. Neville Brown & John S. Bell, *French Administrative Law* (5th ed. 1998) ...................................................................... App. A

Guido Calabresi & A. Douglas Melamed, *Property Rules, Liability Rules, and Inalienability*, 85 Harv. L. Rev. 1089 (1972) .......... 5

Jeroen M.J. Chorus (ed.), *Introduction to Dutch Law* (5th ed. 2016). App. A

Gaël Chantepie & Mathias Latina, *Le nouveau droit des obligations* (2d ed. 2018) ............................................................ App. A

Civil Code of Japan art. 466 (as amended 2017) ....................... 10

Civil Code of the People's Republic of China art. 545 (2020) ..... 10

CNJ Resolution 303/2019, arts. 42–45 (Brazil) .............. 10, App. A

Conselho Nacional de Justiça [National Council of Justice], *Mapa Anual dos Precatórios 2024* (Brazil 2024) ........................... 10

43 Comp. Gen. 138 (1963) ...................................................... 19

Comp. Gen. Dec. B-13700 (Dec. 2, 1940) ................................... 9

86 Cong. Rec. 12803 (1940) (statement of Sen. Barkley) ........... 18

Digest of Justinian, D.35.2.73.1 (Gaius) ................................... 10

Digest of Justinian, D.45.1.57 (Julian) ..................................... 10

Nelson Goh, *The Assignment of Investment Treaty Claims: Mapping the Principles*, 10 J. Int'l Disp. Settlement 23 (2019) ............ 11

Jeremy Gold, *Accounting/Actuarial Bias Enables Equity Investment by Defined Benefit Pension Plans*, 9 N. Am. Actuarial J. 228 (2005) 15

John Chipman Gray, *Restraints on the Alienation of Property* (2d ed. 1895) ............................................................................... 6

James A. Green, *The Persistent Objector Rule in International Law* (2016) ......................................................................... 13

A.M. Honoré, *Ownership*, in Oxford Essays in Jurisprudence (A.G. Guest ed., 1961) ............................................................... 5

Chrysippus, *in* Sextus Empiricus, Adversus Mathematicos VIII.223–227, *translated in* A.A. Long & D.N. Sedley (eds.), The Hellenistic Philosophers Vol. 1 (Cambridge Univ. Press 1987). 10

Dignāga, *Pramāṇasamuccaya*, *translated in* Masaaki Hattori, *Dignāga, On Perception* (Harvard Univ. Press 1968) ............ 10

Olivier Deshayes, Thomas Genicon & Yves-Marie Laithier, *Réforme du droit des contrats: Commentaire article par article* (2d ed. 2018) App. A

Jacques Herbrand, *Recherches sur la théorie de la démonstration* (1930), *translated in* Warren D. Goldfarb (ed.), Jacques Herbrand: Logical Writings (Harvard Univ. Press 1971) .......... 10

H.R. Hink, *The German Law of Governmental Tort Liability*, 18 Rutgers L. Rev. 804 (1963) ............................................... App. A

Peter W. Hogg, *Liability of the Crown* (2d ed. 1989) ............ App. A

W.S. Holdsworth, *The History of Remedies Against the Crown*, 38 L.Q. Rev. 141 (1922) ......................................................... App. A

Husch Blackwell LLP, Press Release, *Husch Blackwell Secures $47.5 Million Settlement Agreement for TBK Bank, SSB From United States Postal Service* (July 17, 2025) .................................... 17

Antti Ilmanen, *Expected Returns* (2011) ................................. 16

Int'l Law Comm'n, Draft Conclusions on Identification of Customary International Law (2018) ...................................... 10, 13

Lord Justice Jackson, *Review of Civil Litigation Costs: Final Report* (2010) ......................................................................... 20

Louis L. Jaffe, *Suits Against Governments and Officers*, 77 Harv. L. Rev. 1 (1963) ................................................................ 4

Federal Reserve Bank Services, Fedwire Securities Service Annual Statistics (Jan. 2025) ...................................... 16

Fed. Reserve Banks, Operating Circular No. 7: Fedwire Securities Service (eff. Jan. 5, 2026) ................................................. 17

Fiscal Service, Treasury Dep't, Book-Entry Procedures for Treasury Bonds, Notes and Bills, 33 Fed. Reg. 535 (Jan. 16, 1968) 17

Fritz Fleiner, *Institutionen des Deutschen Verwaltungsrechts* (8th ed. 1928) ................................................................. App. A

Axel Flessner & Hendrik L.E. Verhagen, *Assignment in European Private International Law: Claims as Property and the European Commission's "Rome I Proposal"* (2006) ...................... App. A

Victor Fleischer, *Regulatory Arbitrage*, 89 Tex. L. Rev. 227 (2010) 19

Howell E. Jackson, *Regulation in a Multisectored Financial Services Industry*, 77 Wash. U. L.Q. 319 (1999) ............................... 19

Finn E. Kydland & Edward C. Prescott, *Rules Rather than Discretion*, 85 J. Pol. Econ. 473 (1977) ........................................... 2, 15

Rafael La Porta et al., *Law and Finance*, 106 J. Pol. Econ. 1113 (1998) 15

Law Commission (N.Z.), Report R37: Crown Liability and Judicial Immunity (1997) ...................................... App. A

D.W. Logan, *A Civil Servant and His Pay*, 61 L.Q. Rev. 240 (1945)....
App. A

Leora Klapper, *The Role of Factoring for Financing Small and Medium Enterprises*, 30 J. Banking & Fin. 3111 (2006) ..................... 15

Georges Langrod, *Administrative Contracts: A Comparative Study*, 4 Am. J. Comp. L. 325 (1955) ....................................... App. A

Barbara Koremenos, Charles Lipson & Duncan Snidal, *The Rational Design of International Institutions*, 55 Int'l Org. 761 (2001). 15

Souichirou Kozuka, *Between Globalization and Localization: Japan's Struggle to Properly Update Its Civil Code*, in The Making of the Civil Codes 181 (Springer 2023) ................................. App. A

Matt Levine, *The Tariff Refund Trade*, Bloomberg Opinion, Oct. 27, 2025 ............................................................... 17

Eliza Ronalds-Hannon et al., *New Tariff Trades Show Wall Street Doubt Over Refund Payouts*, Bloomberg, Nov. 14, 2025 ....... 17

R.E. Manning, *The Development of Restraints on Alienation Since Gray*, 48 Harv. L. Rev. 373 (1935) ....................................... 6

Hartmut Maurer & Christian Waldhoff, *Allgemeines Verwaltungsrecht* (20th ed. 2020) ........................................... App. A

Otto Mayer, *Deutsches Verwaltungsrecht* (1895–96) ............. App. A

Münchener Kommentar zum BGB, Band 3, § 398 (Roth/Kieninger) (9th ed. 2022) ........................................................ App. A

Thomas W. Merrill & Henry E. Smith, *The Morality of Property*, 48 Wm. & Mary L. Rev. 1849 (2006) ....................................... 6

Douglass C. North & Barry R. Weingast, *Constitutions and Commitment*, 49 J. Econ. Hist. 803 (1989) ..................................... 15

Fritz Ossenbühl & Matthias Cornils, *Staatshaftungsrecht* (6th ed. 2013) ...................................................................... App. A

Note, *Unassignable Claims Against the United States: A Commercial Anachronism,* 68 Yale L.J. 515 (1959) .................................. 16

Notice of Determination of Need, 61 Fed. Reg. 29,539 (June 11, 1996) ........................................................................... 17

Margaret Jane Radin, *Contested Commodities* (1996) .................. 5

Charles A. Reich, *The New Property*, 73 Yale L.J. 733 (1964) ......... 4

Solène Rowan, *The New French Law of Contract* (2022) ........ App. A

M.H.E. Rongen, *Cessie* (diss. Nijmegen, Kluwer 2012) ....... App. A

Alfred Salomons, *Deformalisation of Assignment Law and the Position of the Debtor in European Property Law,* 15 Eur. Rev. Priv. L. 639 (2007) ............................................................ App. A

Restatement (Third) of Foreign Relations Law § 102 ............... 10

William A. Roberts, III & Kay Tatum, *The Novation of Government Contracts and the Unreliable and Unpredictable "Operation of Law" Exception*, 50 Procurement Law. 11 (2014) ............... 16

Thomas C. Schelling, *The Strategy of Conflict* (1960) ................. 15

Secretaria do Tesouro Nacional [National Treasury Secretariat], *Painel dos Precatórios, in* Riscos Fiscais com Demandas Judiciais e Precatórios (Brazil 2024) ........................................ 10

Anthony J. Sebok, *Third-Party Litigation Finance: Law, Policy, and Practice* (Aspen 2024) .................................................... 20

Floyd D. Shimomura, *The History of Claims Against the United States,* 45 La. L. Rev. 625 (1984) ................................................... 4

Maya Steinitz, *Whose Claim Is This Anyway? Third Party Litigation Funding*, 95 Minn. L. Rev. 1268 (2011) .............................. 20

Staudinger, Kommentar zum BGB, §§ 397–432 (2017) ........ App. A

Hiroo Sono et al., *Contract Law in Japan* (Kluwer 2019) ...... App. A

Robert Wilson, *The Theory of Syndicates*, 36 Econometrica 119 (1968) ............................................................ 15

Loren A. Smith, *Why a Court of Federal Claims*, 71 Geo. Wash. L. Rev. 773 (2003) ....................................................... 4

Harry Street, *Governmental Liability: A Comparative Study* (1953)... App. A

Ted L. Stein, *The Approach of the Different Drummer*, 26 Harv. Int'l L.J. 457 (1985) .............................................. 13

TreasuryDirect, Timeline of the Treasury Marketable Securities Program ...................................................... 16

UNCITRAL Convention on the Assignment of Receivables in International Trade (2001) ................................................ 9, 10

A.J. Verdaas, *De stille cessie in de praktijk*, WPNR 2004 ........ App. A

Wang Liming, *Legislation in Book III Contract of the Civil Code*, China Int'l Com. Ct. (2022) ...................................... 10

Shelly Aviv Yeini, *The Persistent Objector Doctrine: Identifying Contradictions*, 22 Chi. J. Int'l L. 581 (2022) .................................. 13

––––––

APPENDIX A

COMPARATIVE LAW SURVEY: ASSIGNMENT OF CLAIMS AGAINST SOVEREIGNS

––––––

This Appendix provides statutory and scholarly citations for each jurisdiction referenced in Part III.

*1. United Kingdom*

Section 136 of the Law of Property Act 1925, 15 & 16 Geo. 5, c. 20, permits legal assignment of any debt or chose in action by written instrument with notice to the debtor. Before 1948, claims against the Crown proceeded by petition of right, which required royal *fiat* and was personal to the petitioner. W.S. Holdsworth, *The History of Remedies Against the Crown*, 38 L.Q. Rev. 141 (1922). The Crown Proceedings Act 1947, 10 & 11 Geo. 6, c. 44, abolished the *fiat* requirement; Section 1 provides that claims "may be enforced as of right." The Act contains no general restriction on assignment of Crown debts. Section 27(1)(b) preserves only those specific statutory restrictions enacted by separate legislation—such as the non-

assignability of civil servant salaries, D.W. Logan, *A Civil Servant and His Pay*, 61 L.Q. Rev. 240 (1945). *See* T. Barnes, *The Crown Proceedings Act, 1947*, 26 Can. B. Rev. 387 (1948); Peter W. Hogg, *Liability of the Crown* (2d ed. 1989).

*2. Germany*

Section 398 of the Bürgerliches Gesetzbuch (BGB) establishes free assignability: "*Eine Forderung kann von dem Gläubiger durch Vertrag mit einem anderen auf diesen übertragen werden (Abtretung). Mit dem Abschluss des Vertrags tritt der neue Gläubiger an die Stelle des bisherigen Gläubigers.*" *See* Münchener Kommentar zum BGB, Band 3, § 398 (Roth/Kieninger) (9th ed. 2022); Staudinger, Kommentar zum BGB, §§ 397–432 (2017). This provision applies without categorical exception for claims against the state. The *Fiskus* doctrine treats the state as a private legal entity when acting in its commercial capacity (*fiskalisch*) rather than its sovereign capacity (*hoheitlich*). *See* Otto Mayer, *Deutsches Verwaltungsrecht* (1895–96); Fritz Fleiner, *Institutionen des Deutschen Verwaltungsrechts* (8th ed. 1928); Hartmut Maurer & Christian Waldhoff, *Allgemeines Verwaltungsrecht* § 3 (20th ed. 2020). Claims arising from official

liability (*Amtshaftung*) under Article 34 of the Basic Law and BGB § 839 are assignable under private law rules. *See* Fritz Ossenbühl & Matthias Cornils, *Staatshaftungsrecht* (6th ed. 2013); H.R. Hink, *The German Law of Governmental Tort Liability*, 18 Rutgers L. Rev. 804 (1963). Tax refund claims are explicitly assignable under Abgabenordnung § 46(1): "*Ansprüche auf Erstattung von Steuern, Haftungsbeträgen, steuerlichen Nebenleistungen und auf Steuervergütungen können abgetreten, verpfändet und gepfändet werden.*" *See* Edwin M. Borchard, *Government Liability in Tort* (1924); Harry Street, *Governmental Liability: A Comparative Study* 1–45 (1953).

### 3.  France

The Code Civil, as reformed by Ordonnance n° 2016-131 of February 10, 2016, governs assignment (*cession de créance*) in Articles 1321–1326. Article 1321 provides: "*La cession de créance est un contrat par lequel le créancier cédant transmet, à titre onéreux ou gratuit, tout ou partie de sa créance contre le débiteur cédé à un tiers appelé le cessionnaire…. Le consentement du débiteur n'est pas requis.*" The debtor's consent is not required. Article 1323 provides that assignment is effective against third

parties upon execution of the written instrument. *See* Gaël Chantepie & Mathias Latina, *Le nouveau droit des obligations: Commentaire théorique et pratique dans l'ordre du Code civil* (2d ed. 2018); Olivier Deshayes, Thomas Genicon & Yves-Marie Laithier, *Réforme du droit des contrats: Commentaire article par article* (2d ed. 2018); Solène Rowan, *The New French Law of Contract* 245–58 (2022). The Code Civil contains no exclusion for claims against the State (*État*) or other public persons (*personnes publiques*). The Loi Dailly (Loi n° 81-1 du 2 janvier 1981) established a simplified assignment procedure for professional receivables, including claims against public entities; *cession Dailly* is routinely used by contractors on government contracts to assign receivables to banks. *See* L. Neville Brown & John S. Bell, *French Administrative Law* 179–204 (5th ed. 1998); Georges Langrod, *Administrative Contracts: A Comparative Study*, 4 Am. J. Comp. L. 325 (1955).

### 4. Netherlands

The Burgerlijk Wetboek (BW) of 1992 codifies assignment (*cessie*) in Article 3:94(1): "*Buiten de in het vorige artikel geregelde gevallen worden tegen een of meer bepaalde personen*

*uit te oefenen rechten geleverd door een daartoe bestemde akte, en mededeling daarvan aan die personen door de vervreemder of verkrijger.*" Assignment requires a deed (*akte*) and notification (*mededeling*) to the debtor. Article 6:142 provides that accessory rights (*nevenrechten*) pass automatically with the assigned claim. The 2004 amendment (Stb. 2004, 314; Kamerstukken II 2002/03, 28 878) added Article 3:94(3), permitting *stille cessie* (silent assignment) without notification where the deed is authenticated or registered. *See* M.H.E. Rongen, *Cessie* (diss. Nijmegen, Kluwer 2012); A.J. Verdaas, *De stille cessie in de praktijk*, WPNR 2004; Axel Flessner & Hendrik L.E. Verhagen, *Assignment in European Private International Law* (2006). The Dutch State (*De Staat der Nederlanden*) possesses legal personality under BW art. 2:1 and is subject to ordinary civil law; claims against the State are assignable under the same rules as claims against private parties. *See* HR 16 mei 2003, ECLI:NL:HR:2003:AF4603 (De Liser de Morsain/ Rabobank) (cessie requirements); Asser/Bartels & Van Mierlo 3-IV, *Algemeen goederenrecht* (2021); Jeroen M.J. Chorus (ed.), *Introduction to Dutch Law* (5th ed. 2016); Alfred Salomons,

*Deformalisation of Assignment Law*, 15 Eur. Rev. Priv. L. 639 (2007).

5. *Italy*

The Codice Civile governs assignment (*cessione del credito*) in Articles 1260–1267. Article 1260 provides: "*Il creditore può trasferire a titolo oneroso o gratuito il suo credito, anche senza il consenso del debitore, purché il credito non abbia carattere strettamente personale o il trasferimento non sia vietato dalla legge.*" The creditor may transfer his claim without the debtor's consent unless the claim is strictly personal or transfer is prohibited by law. Article 70 of R.D. 2440/1923 (Legge sulla Contabilità dello Stato) requires state consent (*adesione*) for assignment of claims arising from ongoing public contracts—but the Corte di Cassazione has construed this restriction narrowly. Cass. civ. n. 25284/2023 held that Article 70 applies only to contracts of duration (*appalto, somministrazione*) during execution, not to completed claims; Cass. civ. n. 29420/2023 held it does not apply to claims against local health agencies (*aziende sanitarie locali*) or other entities outside the central state administration. The restriction thus applies only to claims arising from

ongoing contracts with central state ministries; completed claims and claims against regional or local entities are freely assignable.

6. *Switzerland*

The Obligationenrecht (OR) governs assignment (*Abtretung* French: *cession*) in Articles 164–174. Article 164(1) provides: "*Der Gläubiger kann eine ihm zustehende Forderung ohne Einwilligung des Schuldners an einen andern abtreten, soweit nicht Gesetz, Vereinbarung oder Natur des Rechtsverhältnisses entgegenstehen.*" The creditor may assign a claim without the debtor's consent unless prohibited by law, agreement, or the nature of the obligation. Article 165 requires written form (*schriftliche Form*); Article 167 preserves the debtor's defenses against the assignee. The Verantwortlichkeitsgesetz (VG) SR 170.32—the Federal Government Liability Act of 1958—creates claims against the Confederation for wrongful official acts (Articles 3–9) and prescribes procedural rules (Article 10) and limitation periods incorporating OR provisions (Article 20). The VG contains no provision restricting assignment of such

claims; general OR assignment rules apply to claims against public entities.

*7. Japan*

The Civil Code governs assignment of claims (*saiken jōto*, 債権譲渡) in Articles 466–469, substantially reformed by Law No. 44 of 2017 (effective April 1, 2020). Prior to reform, Article 466(2) rendered assignments void where the assignee knew or was grossly negligent in not knowing of a contractual anti-assignment clause (*jōto seigen tokuyaku*, 譲渡制限特約); the new Article 466(2) validates such assignments while permitting the debtor to discharge by paying the original creditor. The reform aimed to facilitate receivables financing for small and medium enterprises. *See* Souichirou Kozuka, *Between Globalization and Localization: Japan's Struggle to Properly Update Its Civil Code*, in The Making of the Civil Codes 181 (Springer 2023); Hiroo Sono et al., *Contract Law in Japan* ch. 11 (Kluwer 2019); Ministry of Justice, 民法(債権関係)の改正に関する説明資料 [Explanatory Materials on Civil Code (Obligations) Reform] (2017). The Public Accounting Act (会計法, Act No. 35 of 1947) governs government contracting (Articles 29–29-12),

limitation periods for claims by and against the State (Articles 30–32), and treasury procedures (Articles 33–46). The Act contains no provision restricting assignment of claims against the national government; perfection follows general Civil Code rules or the Act on Special Provisions for Assignment Registration (Act No. 104 of 1998).

*8.  Australia*

Legal assignment of choses in action follows common law rules supplemented by state legislation modeled on the UK Law of Property Act 1925. The Judiciary Act 1903 (Cth), Part IX (Sections 56–67), governs suits by and against the Commonwealth; Section 56 abolishes the petition of right and provides that "any person making any claim against the Commonwealth… may… bring a suit against the Commonwealth." Section 64 mandates procedural equality: "the rights of parties shall as nearly as possible be the same, and judgment may be given and costs awarded on either side, as in a suit between subject and subject." Section 65 provides that execution cannot issue against the Commonwealth; judgments are satisfied through parliamentary appropriation under Section 66. The

Judiciary Act contains no provision restricting assignment of claims against the Commonwealth.

9.  *New Zealand*

The Crown Proceedings Act 1950 abolished the petition of right and established Crown liability in tort and contract. Section 3 provides that proceedings "may be instituted against the Crown as of right" without fiat. Section 6 imposes vicarious liability for Crown servants' torts. The Act does not address assignment of claims. The Law Commission stated that "the citizen has the right to sue the Crown, effectively as an equal" and that "legal procedures relating to and remedies against the Crown are the same as those which apply to ordinary persons." Law Commission, *Crown Liability and Judicial Immunity: A Response to Baigent's Case and Harvey v Derrick*, Report R37, at 6 (1997). General assignment law is codified in the Property Law Act 2007, Section 50 (equitable assignment of things in action), and the Contract and Commercial Law Act 2017, Sections 54–57 (assignment of contractual rights). Section 55(1) limits assignees' liability to the value of the assigned benefit.

*10. Canada*

The Financial Administration Act (FAA), R.S.C. 1985, c. F-11, Part VII, governs assignment of Crown debts. Section 66 defines "Crown debt" as "any existing or future debt due or becoming due by the Crown, and any other chose in action in respect of which there is a right of recovery enforceable by action against the Crown." Section 67 provides that "a Crown debt is not assignable" and that "no transaction purporting to be an assignment of a Crown debt is effective." Section 68(1) creates an exception for "a Crown debt that is an amount due or becoming due under a contract," provided the assignment is absolute, in writing, and notice is given to the Crown under Section 69; the Crown must acknowledge receipt before the assignment is effective against it. Section 68(5) excludes wages, salaries, pay, and allowances from the exception.

*11. Brazil*

The Código Civil governs assignment (*cessão de crédito*) in Articles 286–298. Article 286 provides: "*O credor pode ceder o seu crédito, se a isso não se opuser a natureza da obrigação, a lei, ou a convenção com o devedor.*" The creditor may assign the claim

unless opposed by the nature of the obligation, law, or agreement with the debtor. Article 290 requires notice to the debtor for the assignment to be effective against him. Court-ordered government payment obligations (*precatórios*) are governed by Article 100 of the Constitution and the Ato das Disposições Constitucionais Transitórias (ADCT). Emenda Constitucional 30/2000 added ADCT Article 78, expressly permitting "*a cessão dos créditos*" (assignment of the claims). The Conselho Nacional de Justiça regulates the system through Resolução 303/2019, which establishes assignment registries and procedures in Articles 42–45. Article 42 provides: "*O beneficiário poderá ceder, total ou parcialmente, seus créditos a terceiros, independentemente da concordância da entidade devedora.*" The beneficiary may assign claims in whole or in part to third parties, without the debtor entity's consent. The constitutionality of the precatório regime was upheld in ADI 4357/DF and ADI 4425/DF. *See* Conselho Nacional de Justiça, *Mapa Anual dos Precatórios 2024* (2024); Secretaria do Tesouro Nacional, *Painel dos Precatórios*, *in* Riscos Fiscais com Demandas Judiciais e Precatórios (2024). Outstanding precatório obligations totaled

R$310.9 billion as of December 2024; claims trade actively on secondary markets at discounts reflecting debtor creditworthiness, queue position, and expected payment timeline.

———

# Appendix B

## Motion for Leave to File Brief of Amicus Curiae

———

United States Court of Federal Claims

No. 24-775

_____

EDUCATION CREDITOR TRUST and

U.S. BANK TRUST COMPANY, NATIONAL ASSOCIATION,

*Plaintiffs,*

v.

THE UNITED STATES,

*Defendant.*

_____

# Motion for Leave to File

# Brief of Amicus Curiae Nadja Yang

# Addressing the Constitutionality of

# the Anti-Assignment Act

Nadja Yang respectfully moves for leave to file the preceding brief as amicus curiae addressing the constitutionality of the Anti-Assignment Act, 31 U.S.C. § 3727 and 41 U.S.C. § 6305. In support of this motion, amicus states as follows:

*1. Interest of Amicus Curiae*

Nadja Yang studies regulatory institutions through ethnographic observation of practitioner communities. Her work concerns the archaeology of loss—how deprivation becomes invisible through institutionalization, and the conditions under which it may be recovered.

Amicus has no stake in the underlying contract dispute between the parties. The questions raised here are older than this case and will outlast it. Amicus seeks leave to address a question of public importance—the constitutionality of the Anti-Assignment Act—that transcends the interests of the parties and was not raised in prior proceedings.

*2. Procedural Background*

This case arises from Plaintiffs' claims to approximately $92 million in letter-of-credit proceeds allegedly misused by the Department of Education. Plaintiffs, creditors of Education Management Corporation ("EDMC"), acquired their interest in these proceeds through a foreclosure agreement followed by EDMC's Chapter 7 bankruptcy, which together transferred EDMC's contractual rights against the government to Plaintiffs.

The Government moved to dismiss, arguing that Plaintiffs lacked privity of contract and that the Anti-Assignment Act, 31 U.S.C. § 3727 and 41 U.S.C. § 6305, barred the transfer of EDMC's claims. On February 27, 2025, this Court denied the motion as to the breach of contract claims (Counts 1 and 2), holding that the "operation of law" exception to the Anti-Assignment Act applies where the transfer occurred through

foreclosure and bankruptcy to satisfy debts owed to creditors. *See* Opinion and Order (Feb. 27, 2025), ECF No. 20, at 15–18 (applying *Goodman v. Niblack*, 102 U.S. 556 (1880), and *Seaboard Air Line Ry. v. United States*, 256 U.S. 655 (1921)). The Court granted the motion as to Plaintiffs' Fifth Amendment takings claim (Count 3), holding that Plaintiffs could not assert a property interest in a partial fund of money. *Id.* at 19–20.

The Court's ruling applied the Anti-Assignment Act as a valid statute, finding only that an exception applied on these facts. The constitutional validity of the Act was not raised by the parties and was not addressed by the Court.

3. *Why an Amicus Brief Is Desirable*

This Court permits amicus participation where the proposed brief offers "specialized knowledge" that will "facilitate resolution" of the issues before the Court. *See Hage v. United*

*States*, 35 Fed. Cl. 737, 742 (1996); *Health Republic Ins. Co. v. United States*, 129 Fed. Cl. 115, 116–17 (2016). The proposed brief satisfies this standard by offering expertise in three areas not addressed by the parties: comparative foreign law, financial economics, and mechanism design theory.

The brief's central contribution concerns a Fifth Amendment takings question distinct from Plaintiffs' dismissed Count 3. Plaintiffs sought compensation for funds allegedly misused by DOE—a claim this Court rejected because a property interest cannot attach to a partial fund. *See* Opinion at 19–20. The brief raises a different question: whether the Anti-Assignment Act *itself* effects an uncompensated taking by stripping the alienation right from claims that are otherwise constitutionally protected property. This is a taking of a property *right* (the right to dispose), not a taking of money.

A cause of action is "a species of property protected by the... Due Process Clause," *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982), and the right to dispose of property is a fundamental stick in the bundle, *Horne v. Dep't of Agric.*, 576 U.S. 351, 361–62 (2015). Stripping alienability while leaving the bare claim effects an appropriation requiring just compensation—the paradigm claim within this Court's Tucker Act jurisdiction. This argument was not presented by Plaintiffs and was not addressed in the Court's February 27 ruling.

The brief also provides specialized knowledge unavailable from the parties:

*Comparative law*: The brief surveys jurisdictions including Brazil, Germany, Japan, and the United Kingdom—documenting that the United States stands alone among developed economies in prohibiting assignment of claims against the sovereign. This comparative analysis, drawing on foreign

statutory citations (e.g., BGB § 398, CNJ Resolution 303/2019), provides context for interpreting the scope of Congressional power.

*Financial economics*: The brief applies mechanism design theory—including the Nobel Prize-winning work of Kydland and Prescott on credible commitment—to demonstrate that restricting creditor rights undermines the government's own interests. This economic analysis illuminates the logic behind Congress's 1940 banking exception.

*Treaty evidence*: The United States' Article 40 reservation to the UNCITRAL Convention on the Assignment of Receivables constitutes *opinio juris* that the international norm favors alienability—the United States would not reserve against a norm it believed did not exist.

These perspectives are not represented by the parties and may assist the Court in evaluating the constitutional validity of the Anti-Assignment Act.

4. *Relevance to the Disposition of the Case*

The Anti-Assignment Act remains central to this litigation. This Court's February 27 ruling resolved the Act's application to *these* plaintiffs on *these* facts—but the constitutional validity of the Act was neither briefed nor decided. Amicus has limited Public Access to Court Electronic Records (PACER) access; the constitutional question raised herein is independent of the case's current procedural posture. Should the Government appeal the "operation of law" ruling, or should the Act's scope arise at summary judgment, the constitutional question becomes directly relevant. More broadly, a ruling on the Act's constitutionality would provide guidance

for future claimants who cannot satisfy the foreclosure-plus-bankruptcy pathway that Plaintiffs happened to traverse.

The proposed brief's principal argument—that stripping alienability from otherwise-enforceable claims effects an uncompensated taking under the Fifth Amendment—falls within this Court's core Tucker Act jurisdiction. This argument is distinct from Plaintiffs' dismissed takings claim and presents a question of first impression. The brief provides an alternative constitutional basis for confirming that Plaintiffs' claims are not barred, while preserving additional arguments for appellate review.

5.  *Request for Leave to File Overlength Brief*

The proposed brief contains 12946 words in the Argument section. Amicus respectfully requests leave to file this overlength brief because the analysis requires extended treatment.

While the RCFC contains no specific rule governing amicus briefs, amicus acknowledges that FRAP 29—which courts often consult for guidance—limits amicus briefs to approximately 6,500 words. The additional length here is necessary for three reasons:

*First*, the brief presents comparative legal analysis across jurisdictions including specific statutory citations from Brazil (CNJ Resolution 303/2019), Germany (BGB § 398), Japan (Civil Code art. 466 as amended 2017), and the United Kingdom (Crown Proceedings Act 1947)—documenting that the United States stands alone among developed economies in prohibiting assignment. This survey cannot be meaningfully condensed without sacrificing the evidentiary basis for the customary international law argument.

*Second*, while the brief's principal constitutional argument—that stripping alienability effects an uncompensated

taking—is squarely within this Court's jurisdiction, the brief also provides context regarding enumerated powers and equal protection that may assist this Court and inform any subsequent appellate review. The Act's 1940 financing institution exception creates discriminatory classifications across both claim types and assignee types, warranting separate doctrinal treatment.

*Third,* the financial economics analysis documents concrete value destruction—including the *TBK Bank* litigation involving $200 million in misdirected payments—and draws on established scholarship regarding illiquidity premiums to demonstrate that the Act fails rational basis review by undermining the government's own interests.

The Court's consideration of these issues at the trial level will create a complete record for any subsequent appellate

review. Amicus submits that the importance of the constitutional questions raised justifies the extended treatment.

———

## Conclusion

———

For the foregoing reasons, Nadja Yang respectfully requests that the Court grant leave to file the preceding brief as amicus curiae.

Respectfully submitted,

/s/ Nadja Yang

NADJA YANG, *Pro Se*

WeWork c/o Nadja Yang

115 Broadway Street, 5th Floor

139

New York, NY 10006

Fax: (212) 918-0747

Email: nadjay@cls.institute


Dated: 2026-01-25

140

_____

PROPOSED ORDER

_____

Upon consideration of the Motion for Leave to File Brief of Amicus Curiae Nadja Yang Addressing the Constitutionality of the Anti-Assignment Act, it is hereby:

ORDERED that the motion is GRANTED; and it is further

ORDERED that the Clerk shall file the preceding brief as amicus curiae.


_____

The Honorable Eric G. Bruggink

Senior Judge

United States Court of Federal Claims


Dated: _____

———

## Appendix C

### Certificate of Service

———

———

CERTIFICATE OF SERVICE

———

I hereby certify that on *2026-01-25,* I filed the foregoing Brief of Amicus Curiae Nadja Yang and Motion for Leave to File (Appendix B) with the Clerk of the Court for the United States Court of Federal Claims by email to ProSe_case_filings@cfc.uscourts.gov and will provide a courtesy paper copy as required.

I understand that the Clerk will serve counsel for the parties through the CM/ECF system upon docketing.

Amicus has not filed an E-Notification Consent Form (RCFC Appendix of Forms, Form 15A) and does not request service by mail. Amicus will monitor filings through CourtListener and the RECAP Archive (CourtListener is a free legal research website containing millions of legal opinions from

143

federal and state courts, operated by the Free Law Project, a California nonprofit public benefit corporation dedicated to providing public access to primary legal materials; the RECAP Archive is a searchable collection of millions of PACER documents gathered to address what the Free Law Project describes as "the PACER Problem").


/s/ Nadja Yang

NADJA YANG, *Pro Se*