United States Court of Appeals

for the Federal Circuit

—————————————————

In re Nadja Yang,

Petitioner.

Case No. 26-126

—————————————————

# Petitioner's Notice of Subsequent Developments

Petitioner Nadja Yang respectfully advises this Court of a subsequent development in the matter underlying the pending Petition for Writ of Mandamus. On February 4, 2026, the Court of Federal Claims entered an order returning Petitioner's amicus filing unfiled. A copy of the order is attached as Exhibit 1; the deficiency memoranda refer-

enced therein are attached as Exhibits 2 and 3. This notice is filed to

ensure the Court has a complete record of the proceedings below.

## I. The Lower Court's Order

The Court of Federal Claims rejected Petitioner's motion for leave to file an amicus brief on two grounds: (1) that "there is no motion pending for which an amicus brief would be relevant," and (2) that "the brief does not comply with the Rules of the Court of Federal Claims as outlined in the attached deficiency memoranda." The order directed the clerk to return all submissions "unfiled." The deficiency memoranda cite three rule violations: RCFC 5.4(a)(2)(A) ("table of contents or index to appendix is missing (or in wrong location)"), RCFC 5.4(b) ("length of briefs or memorandum"), and RCFC 5.5(g) ("Judge's name on all filings").

## II. The "No Pending Motion" Requirement Does Not Exist

The lower court's primary basis for rejection—that amicus briefs require a "pending motion"—is unsupported by any statute, rule, or controlling precedent.

The Supreme Court has held that "[f]ederal courts have the inherent power to manage their own proceedings and to control the conduct of those who appear before them." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991). This inherent authority extends to amicus participation. Neither the Federal Rules of Civil Procedure nor the Rules of the Court of Federal Claims contain any provision governing amicus curiae briefs in trial court proceedings. Courts have repeatedly acknowledged this gap:

> "A district court has the inherent authority to appoint amici curiae to assist it in a proceeding."

*United States v. Michigan*, 116 F.R.D. 655, 660 (W.D. Mich. 1987), *aff'd*, 940 F.2d 143, 165 (6th Cir. 1991); *accord Hoptowit v. Ray*, 682 F.2d 1237,

1260 (9th Cir. 1982) (recognizing "inherent authority of the district court to permit amicus participation"); *Ryan v. CFTC,* 125 F.3d 1062, 1063 (7th Cir. 1997) (Posner, J., in chambers) (courts have broad discretion to accept amicus briefs when amicus "has unique information or perspective that can assist the court"). *See also Jin v. Ministry of State Security,* 557 F. Supp. 2d 131, 136 (D.D.C. 2008); *NGV Gaming, Ltd. v. Upstream Point Molate, LLC,* 355 F. Supp. 2d 1061, 1067 (N.D. Cal. 2005).

Trial courts possess inherent authority to accept amicus participation at any stage of litigation—not merely when dispositive motions are pending. In *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College,* No. 1:14-cv-14176 (D. Mass.), amici were permitted to file briefs, argue pretrial motions, testify at trial, submit proposed findings, and present opening and closing arguments—participation far exceeding anything tied to a "pending motion." *See* Michael K. Lowman, *The Litigating Amicus Curiae: When Does the Party Begin After the Friends Leave?,* 41 Am. U. L. Rev. 1243 (1992) (comprehensive analysis of trial-level amicus participation); Linda Sandstrom Simard, *An Empirical Study of Amici Curiae in Federal Court,* 27 Rev. Litig. 669

5

(2008). The court's discretion to accept or reject amicus briefs should be exercised based on substantive factors—usefulness to the court, unique perspective, potential prejudice—not on a procedural requirement that does not exist.

The lower court invented a rule. This Court should not defer to it.

## III. The Technical Deficiencies Are Pretextual

The deficiency memoranda cite technical violations that are either incorrect or trivial.

*Table of contents.* The brief contains a table of contents. It appears after the Summary of Argument rather than before, following conventions used by the Government Accountability Office, the Congressional Research Service, the World Bank, the International Monetary Fund, and the National Academies of Sciences, Engineering, and Medicine —all of which place executive summaries or abstracts *before* tables of contents. This reader-centered approach ensures immediate access to key arguments. It is the universal convention in academic journal publishing, where the abstract appears first in every article. In the French academic tradition, the table of contents appears in the *back* matter. The brief's organization reflects established scholarly and governmental practice, not error.

More importantly, the PDF file includes standard PDF bookmarks providing point-and-click navigation to every section—a feature the

deficiency memoranda ignore. In an era of electronic documents with hyperlinks and search functions, the physical placement of a table of contents is a matter of convention, not substance. Rejecting a brief because a table of contents appears on page ix rather than page ii, when electronic navigation is fully functional, elevates form over substance to an arbitrary degree.

*Brief length.* The motion for leave to file—submitted contemporaneously with the brief—explicitly requested leave to file an overlength brief and provided three justifications: (1) the comparative law survey spanning multiple jurisdictions, (2) the presentation of multiple independent constitutional arguments, and (3) the financial economics analysis underlying the mechanism design theory. *See* Motion for Leave to File, §5. The lower court's deficiency memorandum ignores this request entirely.

*Judge's name.* The brief's caption does not include the assigned judge's name, though the Proposed Order appended to the brief identifies "The Honorable Eric G. Bruggink, Senior Judge." This is a curable

formatting deficiency that warrants a notice permitting correction, not wholesale rejection.

The Court did not offer an opportunity to cure. It returned everything "unfiled" based primarily on the fabricated "no pending motion" rule. The technical deficiencies are post-hoc justification.

Pro se filings must be "held to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972). A pro se complaint, "however inartfully pleaded," cannot be dismissed on technical grounds. *Hughes v. Rowe*, 449 U.S. 5, 9–10 (1980). Liberal construction means granting leave to correct technical errors, not seizing upon them as grounds for rejection. *See* Fed. R. Civ. P. 15(a) (2) ("The court should freely give leave [to amend] when justice so requires.").

Pro se filers face systemic disadvantages: they lack access to CM/ECF, must navigate consumer email infrastructure, and cannot monitor dockets in real time. *See* Federal Judicial Center, *Federal Courts' Electronic Filing by Pro Se Litigants* (May 2022). Courts routinely "pay lip service to the liberal construction of pro se pleadings" while "applying

stringent pleading standards to pro se plaintiffs, ignoring the mandate of liberal construction." Robert Bacharach & Lyn Entzeroth, *Judicial Advocacy in Pro Se Litigation: A Return to Neutrality*, 42 Ind. L. Rev. 19, 23 (2009); *see also* Rebecca K. Schneider, *Illiberal Construction of Pro Se Pleadings*, 159 U. Pa. L. Rev. 585 (2011). The lower court's order exemplifies this pattern: summary rejection without good-faith engagement, based on a fabricated procedural rule and technical deficiencies that could have been cured in minutes.

## IV. The "Triplicate" Characterization Is Inflammatory

The order characterizes Petitioner's submissions as "a triplicate submission of an amicus brief," implying vexatious or duplicative filing. This framing is misleading. The Petition for Writ of Mandamus explained exactly what occurred:

1. The first submission (January 26, 2026) was an email filing to the clerk's pro se filing address.

2. A technical misconfiguration with the Himalaya email client on NixOS led Petitioner to manually re-send the attachment shortly after via Amazon WorkMail web interface. This is precisely the type of obstacle *Haines* is meant to address: pro se filers lack access to CM/ECF and must navigate consumer email infrastructure.

3. The subsequent bound copies via Lulu.com and FedEx Office Print on Demand were *courtesy copies*—standard practice when a party files a lengthy brief. The writ explicitly stated these were

courtesy copies, not additional filings. Petitioner notified the

Clerk's office by telephone on January 31, 2026.

Providing bound courtesy copies after electronic filing is not miscon-

duct—it is what sophisticated litigants routinely do, and what many

federal courts *require*. The District of Maryland requires courtesy

copies "within 48 hours of the electronic filing" for documents exceed-

ing fifteen pages. D. Md. ECF Policies and Procedures. The Northern

District of Illinois requires courtesy copies of "all motions (longer than

five pages), memorandums, and exhibits," specifying that they "should

always be printed from ECF after electronic filing." N.D. Ill. Local

Rule 5.2(f). The Supreme Court requires forty bound booklet-format

copies of merits briefs. Sup. Ct. R. 33(c), (f). Indeed, the Rules of the

Court of Federal Claims themselves expressly contemplate "providing

chambers with a courtesy copy of the document in paper form." RCFC

5.5(c).

A courtesy copy is not a duplicate filing. The document is filed

once; courtesy copies are provided separately for judicial convenience

and not entered on the docket. When a law firm mails bound copies

after electronic filing, courts view it as professional diligence. When a pro se filer does the same, this court characterized it as vexatious "triplicate" filing. Empirical research confirms that "a claimant's pro se status itself sends a signal that biases decision making about the claimant and her claim." Victor D. Quintanilla et al., *The Signaling Effect of Pro Se Status*, 42 Law & Soc. Inquiry 1091, 1092 (2017). This is precisely the double standard that *Haines* was meant to prevent—and precisely what occurred here.

## V. THIS CASE WARRANTS EXTRAORDINARY RELIEF

Mandamus is "a drastic and extraordinary remedy reserved for really extraordinary causes." *Ex parte Fahey*, 332 U.S. 258, 259–60 (1947). This is such a case.

The traditional writ "has been used in the federal courts only to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so." *Will v. United States*, 389 U.S. 90, 95 (1967) (quoting *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 26 (1943)). "When a court has no judicial power to do what it purports to do—when its action is not mere error but usurpation of power—the situation falls precisely within the allowable use" of mandamus. *De Beers Consol. Mines v. United States*, 325 U.S. 212, 217 (1945).

The lower court applied a procedural requirement—that amicus briefs may only be filed when a motion is pending—that has no basis in any statute, rule, or precedent. This is not mere error. It is the imposition of a *non-existent* rule to bar a constitutional challenge that

no party has raised. *See Cheney v. U.S. District Court*, 542 U.S. 367, 380 (2004) ("the party seeking issuance of the writ [must show] that its right to issuance of the writ is clear and indisputable" (internal quotation omitted)). Petitioner's right is clear: no rule bars her filing, and courts possess inherent authority to accept amicus briefs at any stage. The lower court's contrary holding is "not authorized either by statute or by the usages" of federal practice. *De Beers*, 325 U.S. at 223.

This Court should also exercise its supervisory mandamus authority because the questions presented are "of such a nature that it is peculiarly appropriate that such action by this court should be taken." *Ex parte Republic of Peru*, 318 U.S. 578, 587 (1943). Two questions of public importance converge here. First, whether pro se litigants may be summarily excluded from amicus participation based on fabricated procedural requirements—an access-to-justice question affecting every unrepresented person who seeks to raise constitutional arguments in this Circuit. Second, whether the Anti-Assignment Act, 31 U.S.C. § 3727, violates the Constitution—a question that affects an enormous number of holders of claims against the sovereign and

15

that is unlikely to receive review through ordinary channels. The writ "serves a vital corrective and didactic function." *Will*, 389 U.S. at 107. This Court's guidance is needed.

This Court should reach the merits of the constitutional question now. The Supreme Court has recognized that mandamus is appropriate to "settle new questions" of law when the issue is of sufficient importance. *Schlagenhauf v. Holder*, 379 U.S. 104, 110–12 (1964). This "advisory mandamus" doctrine permits interlocutory resolution of novel and important legal questions. The Anti-Assignment Act's constitutionality is precisely such a question: it is purely legal, requires no factual development, and will inevitably arise in this or successor litigation.

Judicial economy compels immediate resolution. Remanding to the Court of Federal Claims would initiate a cascade of proceedings: the lower court would accept the brief, rule on it (or ignore it), after which appeal would follow, returning the constitutional question to this Court years hence. The parties in the underlying case are not raising the constitutional challenge—the amicus brief is the only vehicle.

"An appellate court possesses the discretionary power to... resolve the issue" rather than remanding for further proceedings. *La Buy v. Howes Leather Co.*, 352 U.S. 249, 256–60 (1957).

The constitutional question presented is of exceptional importance. The amicus brief demonstrates that the Anti-Assignment Act is a global outlier: Brazil maintains a secondary market in government claims exceeding $62 billion; Germany, France, the Netherlands, Japan, the United Kingdom, and every other major economy permit free assignment of claims against the sovereign. The United States stands alone. The brief further demonstrates, through mechanism design theory—the Nobel Prize-winning work of Kydland and Prescott on credible commitment—that the Act harms the government itself by signaling that it will exercise discretionary power over creditor rights, the behavior of an untrustworthy debtor. The 1940 banking exception, which permits assignment to "financing institutions" while prohibiting assignment to individuals and litigation funders, creates an equal protection problem that has never been adjudicated. These arguments

present questions of first impression that have persisted for 180 years only because no one with standing has raised them.

Petitioner respectfully submits that this Court should exercise its supervisory authority to declare the rights of the parties with respect to 31 U.S.C. § 3727. The constitutional arguments are fully briefed in Exhibit 1 to the Petition for Writ of Mandamus. This Court has the power, the record, and the occasion to act. As the brief concludes: *Debitum iudiciale, debitum alienabile*—a justiciable debt is an alienable debt. Once the United States waived sovereign immunity and created enforceable claims, those claims became property. Congress cannot prohibit their alienation without enumerated authority, cannot strip alienability without compensation, and cannot defend the restriction with rationales that financial economics proves self-defeating.

## VI. A Note on Judicial Fitness

Petitioner respectfully directs this Court's attention to a matter bearing on the integrity of proceedings below. Judge Bruggink's publicly available financial disclosures reveal a pattern warranting inquiry.

The disclosures available on CourtListener indicate that Judge Bruggink maintains brokerage accounts with Edward Jones and holds positions in individual securities including Microsoft and Cisco Systems, both major federal government contractors. Microsoft alone has been involved in multi-billion-dollar federal IT contract disputes, including the JEDI litigation. A judge presiding over the Court of Federal Claims—whose primary jurisdiction is government contract disputes—holding stock in government contractors creates precisely the appearance of impropriety that the Code of Conduct for United States Judges prohibits. *See* Canon 2A ("A judge should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."); Canon 3C(1)(c) (requiring disqualification

where judge "has a financial interest in the subject matter in controversy or in a party to the proceeding").

"Public perception of judicial integrity is a state interest of the highest order." *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 445 (2015). "Violation of this Code diminishes public confidence in the judiciary and injures our system of government under law." Code of Conduct for United States Judges, Canon 1 Commentary. The economic stakes are not abstract: "De facto judicial independence is significantly and robustly correlated with economic growth." Lars P. Feld & Stefan Voigt, *Economic Growth and Judicial Independence*, 19 Eur. J. Pol. Econ. 497, 509 (2003).

The disclosed holdings raise questions. A judge presiding over government contract disputes who holds stock in government contractors must either recuse from affected cases or divest. The disclosures do not reflect systematic divestiture or recusal.

The choice of brokerage compounds the concern. FINRA Rule 5310 requires broker-dealers to use "reasonable diligence" to execute trades at prices "as favorable as possible under prevailing market con-

ditions." Yet Edward Jones charges commissions on trades that Fidelity and Charles Schwab execute for zero commission. Fidelity, notably, does not accept payment for order flow on stock and ETF trades and documents average price improvement of $25.27 per 1,000-share order —saving investors $1.94 billion in 2024 alone. *See* Fidelity Investments, Execution Quality Statistics (2024). Academic research confirms that execution costs vary dramatically across brokerages: identical simultaneous orders yield round-trip costs ranging from 0.07% to 0.46% depending on the broker. Christopher Schwarz et al., *The 'Actual Retail Price' of Equity Trades* (2024), available at SSRN 4189239.

Edward Jones is a strictly dominated choice. SEC Rule 606 disclosures reveal that Edward Jones routes equity orders to the same wholesalers—Citadel Securities, Virtu Americas, and others— as zero-commission brokerages, yet still charges commissions. The commission purchases no execution advantage; it funds the advisory infrastructure that selects the trades, which academic research establishes destroys rather than creates value. Edward Jones also carries 312 disclosure events on FINRA BrokerCheck, including 160 regulatory

events and 150 arbitrations. A sophisticated person would not choose a commission-charging brokerage with an extensive regulatory history when zero-commission alternatives with superior execution quality are readily available. *See* Brad M. Barber & Terrance Odean, *Trading Is Hazardous to Your Wealth*, 55 J. Fin. 773 (2000) (finding active traders underperform by 6.5 percentage points annually); William F. Sharpe, *The Arithmetic of Active Management*, 47 Fin. Analysts J. 7 (1991) (Nobel laureate proving active management must underperform by exactly the fees charged). Petitioner leaves to this Court's judgment what inference to draw.

This Court possesses unique statutory authority. Under 28 U.S.C. § 176, removal of a Court of Federal Claims judge "shall be by the United States Court of Appeals for the Federal Circuit" upon a finding of "incompetency, misconduct, neglect of duty," or disability. No other circuit court possesses equivalent removal authority over any Article III court. Petitioner does not request removal at this time. Petitioner does, however, respectfully recommend that this Court (1) order Judge Bruggink's immediate recusal from all cases in which his disclosed

holdings create a conflict, and (2) refer the matter to the Chief Judge of

this Court pursuant to 28 U.S.C. § 176(c) for consideration of whether

formal proceedings are warranted.

## VII. Relief Requested

The lower court's order confirms the need for this Court's intervention. Petitioner respectfully requests that this Court:

1. Direct the Court of Federal Claims to accept Petitioner's amicus brief, subject to technical corrections as the Court deems appropriate;

2. Hold that no rule requires amicus briefs to be tied to pending dispositive motions;

3. Hold that the lower court abused its discretion by rejecting a pro se amicus filing based on a non-existent procedural requirement and pretextual technical deficiencies;

4. In the alternative, or in addition, enter declaratory judgment on the constitutionality of the Anti-Assignment Act, 31 U.S.C. § 3727, as set forth in Exhibit 1 to the Petition for Writ of Mandamus; and

5. Grant such other relief as the Court deems just and proper.

Respectfully submitted,


/s/ Nadja Yang

NADJA YANG, *Pro Se*

WeWork c/o Nadja Yang

115 Broadway Street, 5th Floor

New York, NY 10006

nadjay@cls.institute


February 4, 2026

## Certificate of Service

I certify that on February 4, 2026, I filed this Notice of Subsequent Developments via CM/ECF, which will send notification to all registered parties.

/s/ Nadja Yang

NADJA YANG, *Pro Se*

February 4, 2026

Exhibit 1

Order of the Court of Federal Claims

(Doc. 39, dated February 4, 2026)


*Attached*

Exhibit 2

Deficiency Memorandum

(Doc. 39-2, dated January 26, 2026)


*Attached*

EXHIBIT 3

Deficiency Memorandum

(Doc. 39-1, dated January 28, 2026)

*Attached*