UNITED STATES COURT OF APPEALS

FOR THE FEDERAL CIRCUIT

---

In re Nadja Yang,

Petitioner.

Case No. 26-126

---

# PETITIONER'S NOTICE REGARDING

# TRIAL COURT JUDICIAL FITNESS

Nadja Yang, *Pro Se*

WeWork c/o Nadja Yang

115 Broadway Street, 5th Floor

New York, NY 10006

nadjay@cls.institute

TABLE OF CONTENTS

I. The Statutory Purpose of Financial Disclosures ........................ 4

II. Methodology ...................................................... 7

III. Summary of Findings .............................................. 8

IV. The Index Fund Alternative ........................................ 11

V. The Improbability of Alpha ......................................... 13

VI. The Decision-Making Concern ...................................... 24

VII. Recommendation for Coordination .................................. 27

VIII. The Court of Federal Claims and Financial Adjudication ........... 29

IX. Relevance to the Proceedings Below ................................ 32

X. Disclaimer ........................................................ 41

XI. Conclusion ....................................................... 43

Certificate of Service ................................................ 45

Exhibits 1–10 ....................................................... 46

Petitioner Nadja Yang respectfully submits this notice to aid the Court's assessment of matters bearing on the integrity of proceedings below.

In the ordinary course of reviewing publicly available information relevant to proceedings before the Court of Federal Claims, Petitioner examined the financial disclosure filings of the Honorable Eric G. Bruggink for the years 2011–2020. These disclosures, filed pursuant to the Ethics in Government Act of 1978, are publicly available through the Free Law Project's CourtListener database and the Administrative Office of the U.S. Courts. Petitioner's analysis identified certain patterns that may warrant the Court's attention. The ten years of disclosures are attached as Exhibits 1–10.

This notice is filed pursuant to Petitioner's understanding that the disclosure system exists precisely to enable such review. As set forth below, the Ethics in Government Act expressly contemplates that litigants will analyze judicial financial disclosures to identify potential conflicts of interest.

## I. The Statutory Purpose of Financial Disclosures

Congress enacted the Ethics in Government Act of 1978 "to preserve and promote the integrity of public officials and institutions." Pub. L. 95-521, 92 Stat. 1824. The Act requires federal judges to file annual financial disclosure reports and mandates public access: supervising ethics offices "shall, within thirty days after any report is received under this subchapter, permit inspection of such report by or furnish a copy of such report to *any person* requesting such inspection or copy." 5 U.S.C. § 13107(b)(1) (emphasis added).

This universal access provision exists because disclosure and disqualification operate as a unified statutory scheme. The disqualification statute, 28 U.S.C. § 455(b)(4), mandates recusal when a judge has a "financial interest" in a party to the proceeding. But financial interests are not self-disclosing. Without public access to judicial financial disclosures, litigants could never discover disqualifying interests—and § 455(b)(4) would be unenforceable. Congress made disclosures public precisely so that litigants could identify conflicts that judges might overlook or fail to disclose sua sponte.

Congress made this purpose explicit. In requiring annual reports on the disclosure system's operation, Congress specified that such reports must address "what steps or procedures are in place to ensure that *sufficient information is available to litigants to determine if there is a conflict of interest.*" 5 U.S.C. § 13107(b)(3)(C)(v) (emphasis added). The statute does not merely permit litigant review—it treats litigant access to conflict information as a design requirement of the disclosure system itself.

The system is actively used for this purpose. The Government Accountability Office documented that the Administrative Office of the U.S. Courts released approximately 16,000 judicial financial disclosure reports to requesters between 2012 and 2016. GAO-18-406, at 7 (2018). In 2021, the Wall Street Journal used these disclosures to identify 131 federal judges who had violated § 455 by hearing cases involving companies in which they held stock —an investigation possible only because Congress made the disclosures public and litigants (and journalists) reviewed them.

The Ninth Circuit has confirmed this understanding. In *In re Cement Antitrust Litigation,* defendants "advised Judge Muecke by letter that *a comparison of his 1980 financial disclosure report with the names on the master class*

*list* revealed" a disqualifying financial interest. 688 F.2d 1297, 1299 (9th Cir. 1982) (emphasis added). The court treated this comparison as the ordinary and expected operation of the disclosure system—not as an unusual or improper inquiry.

The Code of Conduct for United States Judges confirms this understanding. Canon 2A Commentary states that "[a] judge must expect to be the subject of *constant public scrutiny* and accept freely and willingly restrictions that might be viewed as burdensome by the ordinary citizen." (Emphasis added.) A judge who files public financial disclosures should anticipate that litigants—exercising the rights Congress specifically provided—will review those disclosures.

Petitioner's review of Judge Bruggink's disclosures is precisely the conduct the Ethics in Government Act contemplates and enables. Petitioner files this notice in accordance with her duty of candor to this tribunal. *See* Model Rule 3.3(a) (duty of candor toward tribunal); Fed. R. App. P. 28(j) (supplemental authorities).

## II. Methodology

Petitioner reviewed all ten years of publicly available financial disclo-sure filings for Judge Bruggink (2011–2020), available at CourtListener.com. For each year, Petitioner documented:

1. Brokerage accounts and custodians

2. Individual stock holdings, with attention to federal government con-tractors

3. Mutual fund holdings, including share class and fee structure

4. All transactions (purchases and sales) with dates

5. Patterns suggesting coordinated trading activity

Petitioner then analyzed these findings against the financial economics lit-erature on portfolio construction and the standards articulated in the Code of Conduct for United States Judges.

### III. Summary of Findings

The disclosures reveal the following patterns across the ten-year period:

*Brokerage.* Judge Bruggink maintains accounts with Edward Jones, a full-service brokerage that charges commissions on equity trades. Edward Jones is present in all ten years of disclosures.

*Government contractor holdings.* Judge Bruggink has held individual stock positions in Microsoft Corporation and Cisco Systems continuously since January 27, 2011—both acquired on the same day, along with three other securities—through 2020. The simultaneous acquisition of five securities on a single date is inconsistent with independent security selection and strongly suggests broker-directed portfolio construction. Both Microsoft and Cisco are major federal government IT contractors. Microsoft was a party to the multi-billion-dollar JEDI cloud computing contract litigation. In 2020, Judge Bruggink acquired NVIDIA Corporation, another significant government contractor with Department of Defense and federal AI contracts. AT&T, Caterpillar, Johnson Controls, and QualComm—all government contractors—appear in various years.

*Active trading.* The disclosures document over fifty transactions across the ten-year period. This is not passive buy-and-hold investing. Notable patterns include:

1. January 27, 2011: Five simultaneous stock purchases

2. February 14, 2014: Three simultaneous stock purchases

3. July 25, 2016: Four same-day trades (two purchases, two sales)

4. October 9, 2017: Four same-day trades

5. August–December 2017: General Electric purchased and sold within the same year

6. September 22, 2020: Two simultaneous purchases (NVIDIA and IBM)

The pattern of same-day multi-stock transactions is consistent with broker-directed batch executions rather than investor-initiated decisions.

*Absence of index funds.* The disclosures reveal *zero* holdings in broad-market index funds across the entire ten-year period. All equity exposure is through actively managed mutual funds (Class A shares with front-end loads) or individual stock positions.

*High-cost products.* The mutual fund holdings—Capital Income Builder Fund Class A, Income Fund of America, EuroPacific Growth Fund—are Class

A shares that typically carry 5.75% front-end sales charges and ongoing

12b-1 fees.

## IV. The Index Fund Alternative

The Code of Conduct and the disqualification statute both recognize that index funds eliminate the conflict-of-interest concerns that individual stock holdings create.

Canon 3C(3)(c)(i) provides that "ownership in a mutual or common investment fund that holds securities *is not a 'financial interest'* in such securities unless the judge participates in the management of the fund." (Emphasis added.) The parallel statutory provision, 28 U.S.C. § 455(d)(4)(i), contains identical language.

These provisions reflect a deliberate policy judgment: a judge who holds a broadly diversified, market-capitalization-weighted fund has no "financial interest" in any particular company for disqualification purposes—even if that fund holds Microsoft, Cisco, or any other government contractor. The diversified, passive nature of systematic market exposure eliminates the appearance problem.

Federal employees have ready access to such investments. The Thrift Savings Plan offers broad market exposure with expense ratios of approx-

imately 0.034–0.039%—among the lowest available to any investor class. Institutional-share-class passive vehicles from major fund complexes provide comparable exposure at similarly low cost.

A judge who chooses to hold individual stocks in companies that frequently appear as government contractors—when conflict-free passive alternatives are readily available and explicitly blessed by the Code—raises the question of why. The appearance standard of Canon 2 and § 455(a) asks what "reasonable minds, with knowledge of all the relevant circumstances disclosed by a reasonable inquiry," would conclude. Canon 2A Commentary.

Petitioner respectfully submits that reasonable minds might question why a Court of Federal Claims judge would maintain decade-long positions in Microsoft and Cisco—continuously, through multiple market cycles—rather than holding the capitalization-weighted market portfolio that would provide equivalent systematic exposure without creating any appearance of impropriety.

## V. The Improbability of Alpha

Petitioner anticipates a potential objection: that Judge Bruggink's investment choices reflect a legitimate pursuit of risk-adjusted excess returns ("alpha"). The financial economics literature forecloses this defense.

*The rarity of alpha.* The academic consensus establishes that true alpha —returns attributable to skill rather than luck, factor exposure, or compensation for services—is extraordinarily rare. Fama and French examined the universe of actively managed mutual funds and concluded that "few funds produce benchmark-adjusted expected returns sufficient to cover their costs." Fama & French, *Luck versus Skill in the Cross-Section of Mutual Fund Returns,* 65 J. Fin. 1915 (2010).

Barras, Scaillet, and Wermers applied false discovery rate methodology to separate genuine skill from statistical noise. Their findings are stark: *only 0.6% of funds demonstrate genuine skill* sufficient to cover costs—the remaining 99.4% either track the market (before fees) or actively destroy value. Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas,* 65 J. Fin. 179 (2010). The authors concluded that "most of

the few funds with significant alphas owe their performance to luck alone."
*Id.*

If professional fund managers with research staffs, proprietary data, and institutional resources fail to generate alpha in 99.4% of cases, the probability that an individual investor selecting stocks through a full-service retail brokerage would generate alpha approaches zero.

*Alpha versus compensation for services.* Petitioner acknowledges that genuine alpha—risk-adjusted excess returns derived from informational or analytical advantages—does exist. Renaissance Technologies' Medallion Fund has generated approximately 39% net annualized returns since 1988, representing a statistical anomaly that cannot be explained by known factor exposures. But Medallion's existence confirms rather than refutes the framework: the fund has been closed to outside investors since 1993 and capped at approximately $10 billion precisely because genuine alpha is capacity-constrained and does not scale. *See* Zuckerman, *The Man Who Solved the Market* (2019).

Elite market makers like Jane Street and Citadel Securities also earn substantial returns, but institutional finance properly characterizes these as

compensation for services rather than alpha. Market makers earn the bid-ask spread as payment for providing immediacy, bearing inventory risk, and investing in technological infrastructure. *See* Comerton-Forde et al., *Time Variation in Liquidity: The Role of Market-Maker Inventories and Revenues*, 65 J. Fin. 295 (2010). These returns are available in principle to any firm willing to make the requisite investment; they derive from providing a valuable service, not from superior forecasting of security prices.

Factor premiums—value, momentum, quality—are available to all investors who accept the associated volatility, though their theoretical foundations differ. Value and quality factors have plausible risk-based explanations tied to distress risk and earnings uncertainty. Momentum, by contrast, lacks a compelling risk-based explanation and is better understood through behavioral mechanisms: investor underreaction to information and extrapolative bias that persist due to limits to arbitrage. *See* Daniel & Moskowitz, *Momentum Crashes*, 122 J. Fin. Econ. 221 (2016). Leading practitioners including AQR acknowledge that momentum remains theoretically uncomfortable precisely because it resists efficient-market explanation—yet individual retail investors cannot systematically capture these premiums

through discretionary stock selection regardless of their source. AQR Capital Management, among the most sophisticated quantitative asset managers, explicitly acknowledges that its returns derive primarily from systematic factor exposures rather than security-specific information. As Cliff Asness has written, "true alpha" requires "rational processing of information that is dear"—proprietary insight that, by definition, cannot be accessed through a retail brokerage. Asness, *The Less-Efficient Market Hypothesis*, J. Portfolio Mgmt. (50th Anniversary Issue, 2024).

The critical distinction is between: (1) genuine alpha (zero-sum, capacity-constrained, inaccessible to retail); (2) factor premiums (systematic, available to all, compensation for risk); and (3) trading profits (compensation for services). Individual stock selection through a full-service retail brokerage falls into none of these categories. It is what the academic literature terms an "expression of idiosyncratic views"—the bearing of uncompensated firm-specific risk based on beliefs unsubstantiated by superior information.

*The specific record here.* The disclosures reveal not merely the absence of alpha but affirmative evidence of value destruction.

The General Electric position exemplifies the pattern. Judge Bruggink purchased GE in August 2017 at approximately $25–26 per share. GE announced a dividend cut in November 2017; the stock declined to approximately $17–18 by December 2017, when the position was sold. The sale crystallized a loss of approximately 30–35% over four months. GE subsequently collapsed to below $13 by June 2018 and was removed from the Dow Jones Industrial Average. This timing—purchasing near a local maximum, selling after substantial losses but before partial recovery—is characteristic of what behavioral finance identifies as "selling the losers late," a well-documented cognitive bias. *See* Glaser & Weber, *Overconfidence and Trading Volume*, 32 Geneva Risk & Ins. Rev. 1 (2007).

The January 2011 purchase of iShares Silver Trust (SLV) presents a different but equally concerning pattern: extrapolative expectations, or what practitioners term "return chasing." By January 2011, silver had surged approximately 65% from its early 2010 price of $17 per ounce to approximately $28 per ounce, driven by inflation fears surrounding quantitative easing, U.S. debt ceiling uncertainty, and retail speculation. The purchase was made less than three months before silver peaked at a 31-year high of $49.21 per ounce

in April 2011, after which it crashed over 30% in a single week. Academic research by Barberis, Greenwood, Jin, and Shleifer demonstrates that such extrapolative behavior—where investors project recent price trends into future expectations—is a primary driver of bubble formation and subsequent wealth destruction. *See* Barberis et al., *X-CAPM: An Extrapolative Capital Asset Pricing Model*, 115 J. Fin. Econ. 1 (2015); Greenwood & Shleifer, *Expectations of Returns and Expected Returns*, 27 Rev. Fin. Stud. 714 (2014). The September 2012 sale, occurring approximately 17 months after the crash, reflects the "buy high, hold through crash" pattern characteristic of trend-chasing behavior—buying an asset precisely when its recent performance made it most overvalued and risky.

The Class A mutual fund shares impose quantifiable costs. A 5.75% front-end load on a $10,000 investment means only $9,425 is actually invested—an immediate 5.75% wealth destruction. Over a ten-year horizon assuming 7% market returns, this load alone reduces terminal wealth by approximately $1,131 (5.7%). Combined with the ongoing expense ratio differential between Class A shares (typically 0.75–1.5% annually) and institutional index alternatives (0.03–0.10%), the cumulative wealth destruction

over fifteen years approaches 20% of what a low-cost alternative would have produced.

*What a sophisticated allocation would have returned.* The theoretically optimal portfolio for an investor without superior information is the global market-capitalization-weighted portfolio. While the Capital Asset Pricing Model that originally derived this result has well-documented empirical limitations—the single-factor beta fails to fully explain the cross-section of returns, and anomalies including the low-beta effect contradict specific CAPM predictions, *see* Frazzini & Pedersen, *Betting Against Beta,* 111 J. Fin. Econ. 1 (2014)—the *prescription* survives independently of the model's empirical failures. Sharpe's arithmetic of active management proves mathematically, without reference to CAPM, that active investors in aggregate must underperform passive investors after costs. Grossman and Stiglitz establish that investors without informational advantages rationally free-ride on market prices through passive investment. *See* Grossman & Stiglitz, *On the Impossibility of Informationally Efficient Markets,* 70 Am. Econ. Rev. 393 (1980). Most tellingly, Eugene Fama—whose empirical work with Kenneth French effectively displaced CAPM as a descriptive model—nonetheless recommends

market-capitalization-weighted indexing for retail investors, recognizing

that the practical prescription survives even if the original theory does not.

The market portfolio's optimality for uninformed investors is not a fragile

CAPM artifact but a robust conclusion derived from the basic economics

of information and the arithmetic of zero-sum competition. Any deviation

from this portfolio represents either superior information (implausible for

reasons discussed) or uncompensated idiosyncratic risk.

The portfolio documented in Exhibits 1–10 exhibits extreme home

country bias—100% domestic allocation despite the United States compris-

ing approximately 60% of global market capitalization. The academic liter-

ature identifies "home bias" as one of the most robust and persistent anom-

alies in international finance: investors systematically overweight domestic

securities relative to mean-variance optimization. *See* French & Poterba,

*Investor Diversification and International Equity Markets*, 81 Am. Econ. Rev. 222

(1991). This reflects behavioral factors—familiarity bias, currency illusion,

recency bias from domestic outperformance—rather than rational portfolio

construction.

Petitioner acknowledges that U.S. equities outperformed international markets during much of the 2011–2020 period. But as Cliff Asness of AQR has observed, much of that outperformance derives from the U.S. moving from relatively low valuations to elevated valuations relative to international markets—multiple expansion rather than superior earnings growth. *See* Asness, *The Long Run Is Lying to You*, AQR Cliff's Perspectives (2021). Extrapolating past returns driven by valuation expansion into future expected returns represents a fundamental error in financial reasoning. Ex ante, without foreknowledge of which region would outperform, global diversification dominates concentrated domestic allocation under any standard utility function with risk aversion.

The MSCI All Country World Index—representing approximately 85% of global investable equity market capitalization across 47 developed and emerging markets—provides the institutional benchmark for systematic global equity exposure. David Swensen, Chief Investment Officer of the Yale Endowment, advised individual investors that "the most sensible approach... involves constructing a well-diversified portfolio" with global

exposure at institutional cost structures. Swensen, *Unconventional Success: A Fundamental Approach to Personal Investment* 326 (2005).

The portfolio documented in Exhibits 1–10 deviates from these principles in every respect: concentrated rather than diversified, exclusively domestic rather than global, high-cost rather than institutional-cost, actively traded rather than systematically rebalanced.

*Gambling is not a cognizable interest.* Petitioner recognizes that individual investors have the right to make their own financial choices, including choices the academic literature identifies as suboptimal. But federal judges are not ordinary individual investors. The Code of Conduct requires them to avoid the *appearance* of impropriety—a standard that asks what "reasonable minds, with knowledge of all the relevant circumstances disclosed by a reasonable inquiry," would conclude. Canon 2A Commentary.

A personal preference for speculative trading—what the behavioral finance literature terms "overconfidence-driven" activity, *see* Glaser & Weber, *supra*—cannot override the obligation to avoid conflicts that index fund alternatives would eliminate. The expected return to individual stock picking is negative after costs; the expected return to the market portfolio is the

equity risk premium. Choosing the former over the latter, in a context where the former creates appearance problems and the latter does not, reflects a prioritization of speculative activity over judicial duties.

Petitioner does not suggest that Judge Bruggink's investment returns disqualify him from judicial service. Petitioner observes only that a sophisticated analysis of the disclosed portfolio reveals: (1) near-zero probability of genuine alpha; (2) affirmative evidence of value destruction; and (3) a pattern inconsistent with the conservative, conflict-avoiding approach that the Code of Conduct contemplates.

## VI. The Decision-Making Concern

Even setting aside the conflict-of-interest question, the pattern documented in Exhibits 1–10 raises a distinct concern about decision-making.

The financial economics literature is unanimous that the investment strategy reflected in these disclosures is "dominated"—meaning objectively inferior regardless of market conditions. Nobel laureate William Sharpe proved mathematically that "after costs, the return on the average actively managed dollar will be less than the return on the average passively managed dollar." Sharpe, *The Arithmetic of Active Management*, 47 Fin. Analysts J. 7 (1991). This is not a prediction but an arithmetic certainty: these conclusions "depend only on the laws of addition, subtraction, multiplication and division. Nothing else is required." *Id.*

The empirical literature confirms the theoretical result. Barber and Odean studied 66,465 households and found that the most active traders earned 11.4% annually while the market returned 17.9%—a 6.5 percentage point annual underperformance attributable to trading costs and poor timing. Barber & Odean, *Trading Is Hazardous to Your Wealth*, 55 J. Fin. 773 (2000).

The rational choice literature establishes that a rational actor does not choose dominated strategies. *See* Bernheim, *Axiomatic Characterizations of Rational Choice in Strategic Environments*, 88 Scand. J. Econ. 473 (1986).

A ten-year pattern of dominated investment choices reflects either: (a) independently poor judgment, or (b) inability to critically evaluate the advice being received. Petitioner expresses no opinion as to which explanation applies. Petitioner observes only that either possibility is relevant to assessing the decision-making that produced the order under review.

A judge's role requires evaluating testimony, weighing expert opinions, and assessing the credibility of competing claims. If a judge cannot critically evaluate the financial advice he receives over a decade—advice that has led to a portfolio strategy that every peer-reviewed study identifies as value-destroying—the question arises whether similar patterns affect other forms of judgment.

The behavioral finance literature documents that overconfidence "persists in the face of feedback" due to biased memory mechanisms. Huffman et al., *Persistent Overconfidence and Biased Memory: Evidence from Managers*, 112 Am. Econ. Rev. 3141 (2022). The judicial cognition literature confirms

that judges are susceptible to the same heuristics and biases that affect other decision-makers. *See* Peer & Gamliel, *Heuristics and Biases in Judicial Decisions*, 49 Ct. Rev. 114 (2013).

Petitioner does not accuse Judge Bruggink of any impropriety. Petitioner raises these concerns because the Ethics in Government Act disclosure system exists precisely for such scrutiny, and because a pattern that would constitute a suitability violation if recommended by a broker, and an imprudent investment if made by an ERISA fiduciary, warrants at least inquiry when exhibited by a federal judge.

## VII. Recommendation for Coordination

The Securities and Exchange Commission possesses specialized expertise in evaluating whether investment recommendations satisfy suitability and best-interest standards. The Commission maintains enforcement initiatives specifically addressing unsuitable advice to federal employees, including the Thrift Savings Plan Initiative.

The Judicial Conduct and Disability Act contemplates that judicial councils may refer matters for further action. 28 U.S.C. § 354(b)(2). The Judicial Conference Committee on Financial Disclosure reviews judicial filings and can refer concerns as appropriate.

Petitioner respectfully suggests that this Court, or the Judicial Conference, may wish to consult with the Commission regarding the patterns identified herein. Such coordination would serve the shared institutional interest in maintaining public confidence in the judiciary.

Petitioner further observes that records of any closed investigations into the relevant brokers' practices with respect to federal employees may be

subject to disclosure under the Freedom of Information Act and could bear

on the proceedings here.

## VIII. The Court of Federal Claims and Financial Adjudication

The Court of Federal Claims is not a court of general jurisdiction. It is a specialized tribunal established to adjudicate "complex, high-dollar demands" against the United States—government contract disputes, takings claims, tax refunds—often involving "millions or even billions of dollars." The court's legitimacy derives from its institutional capacity to handle technically demanding litigation that generalist courts cannot efficiently resolve.

The academic literature on specialized courts emphasizes that expertise is the source of legitimacy. Professor Harold Bruff observed that specialized courts must demonstrate competence in their subject matter to maintain "public confidence" in their determinations. Bruff, *Specialized Courts in Administrative Law*, 43 Admin. L. Rev. 329 (1991). Professor Rochelle Dreyfuss argued that standards of review should "reflect the relative competence of the trial and appellate tribunal," and that specialized courts earn deference precisely because of their expertise and deep familiarity with their domain. Dreyfuss, *Specialized Adjudication*, 1990 BYU L. Rev. 377.

COFC judges must routinely evaluate: discount rate selection in damages calculations; present value of future payment streams; lost profits requiring economic modeling; valuation methodologies in takings cases; and competing expert financial testimony. All COFC trials are bench trials—there is no jury to assist in evaluating technical evidence. The judge alone must determine whether a proposed discount rate is appropriate, whether a damages model is reliable, whether a valuation methodology is sound.

The investment patterns documented in Exhibits 1–10 bear on this Court's assessment of whether such determinations, made over decades, reflect the financial sophistication the court's function requires.

*Senior status.* Judge Bruggink was appointed to a fifteen-year term in April 1986. His term expired in April 2001. He has served on "senior status" for twenty-four years—longer than his original appointment. His total tenure now exceeds thirty-nine years from a single fifteen-year commission.

The term-limit structure for Article I judges reflects a deliberate policy judgment: unlike Article III judges who serve for life, Article I judges were to serve fixed terms subject to potential reappointment. This design contemplated periodic democratic accountability. Senior status—which allows

indefinite continued service without reconfirmation—defeats this purpose. *See* Stras & Scott, *Are Senior Judges Unconstitutional?*, 92 Cornell L. Rev. 453 (2007) (questioning constitutional basis for senior status and noting tension with Article III requirements).

A judge serving 260% of his authorized term, without any intervening reconfirmation, exercises judicial power on the strength of an appointment made by a president who left office thirty-seven years ago. Seven subsequent administrations have had no voice in whether this judicial officer continues adjudicating billion-dollar disputes requiring financial expertise.

Petitioner does not suggest that longevity alone disqualifies a judge from service. Petitioner observes only that when a specialized court's legitimacy depends on expertise, and when a judge has served decades beyond his appointed term, the question of whether that expertise exists becomes correspondingly more significant.

## IX. Relevance to the Proceedings Below

Petitioner's proposed amicus brief in the proceedings below challenged the Anti-Assignment Act on rational-basis grounds. The brief's argument depends on the reader understanding several concepts from financial economics: that illiquidity has measurable cost, that present value differs from nominal value, that blocked voluntary transactions create deadweight loss, and that risk-adjusted returns differ from raw returns. Petitioner respectfully observes that the investment patterns documented herein bear on this Court's assessment of whether those arguments received adequate consideration.

*Illiquidity costs.* The amicus brief argued that the Anti-Assignment Act destroys value by making claims against the government illiquid. The brief cited the empirical literature establishing that "assets that cannot be freely traded carry illiquidity premia of 150–300 basis points annually." *See* Amihud, *Illiquidity and Stock Returns,* 5 J. Fin. Markets 31 (2002); Pastor & Stambaugh, *Liquidity Risk and Expected Stock Returns,* 111 J. Pol. Econ. 642 (2003). The implication is that illiquid assets must *outperform* liquid alternatives to

compensate investors for bearing illiquidity risk. Merely matching liquid market returns while accepting illiquidity represents a failure—the investor accepted a cost without receiving compensation.

The portfolio documented in Exhibits 1–10 reflects a different understanding. The disclosed holdings include concentrated positions in individual securities, real estate, and other illiquid assets. If the decisionmaker below evaluated these holdings as "profitable" based on nominal returns —without recognizing that equivalent liquid exposure through index funds would have provided the same systematic returns with daily liquidity, lower costs, and no appearance problems—then the decisionmaker may lack the analytical framework to recognize that illiquidity is a cost requiring compensation, not merely an inconvenience.

*Present value and opportunity cost.* The amicus brief argued that claimants harmed by the Anti-Assignment Act suffer opportunity costs: a contractor holding a claim payable in seven years cannot monetize that claim today, even though "an institutional investor with a long time horizon and diversified portfolio would gladly purchase that claim at a discount reflecting the time value of money." The government's implicit response—

that claimants are not harmed because they eventually receive full nominal payment—ignores that present value differs from nominal value.

The investment patterns documented herein suggest similar reasoning. The General Electric transaction, for example, crystallized a 30–35% loss over four months. A decisionmaker who evaluated this transaction in isolation—"I lost money on GE"—without calculating the opportunity cost of capital tied up in a declining position, or comparing the outcome to what a passive index allocation would have returned, may not recognize opportunity cost as a cognizable harm.

*Deadweight loss.* The amicus brief's rational-basis argument depends on the concept of deadweight loss: "There is no victim, no externality, no market failure being corrected. The statute creates pure deadweight loss." This argument requires understanding that voluntary transactions between willing parties create value, and that blocking such transactions destroys value even if no individual is "harmed" in the colloquial sense.

The disclosures reveal an investment that illustrates deadweight loss with particular clarity. Judge Bruggink purchased ninety acres of timberland in Dale County, Alabama in April 2015, held it for approximately twenty-one

months, and sold it in late 2016 and early 2017. The disclosed income from the property was a hunting lease generating approximately $950 per year—roughly $10.56 per acre.

Timberland is an institutional asset class. Timber Investment Management Organizations (TIMOs) typically require minimum investments of approximately $30 million for individual accounts precisely because professional forestry management—optimized harvest timing, silviculture expertise, market intelligence for timber sales—generates returns unavailable to passive or amateur owners. *See* Healey, Corriero & Rozenov, *Timber as an Institutional Investment,* J. Alternative Investments (2005). The NCREIF Timberland Index documents that professionally managed institutional timber portfolios have historically generated returns of 8–12% annually. *See* Zhang, Butler & Nagubadi, *Institutional Timberland Ownership in the US South,* 110 J. Forestry 355 (2012).

A retail investor who purchases timberland competes with institutions on acquisition but cannot replicate institutional operational capabilities. The result is not merely personal underperformance but actual resource misallocation: productive land held below its optimal use generates less

timber, less economic output, and less value than the same acreage under professional management. This is textbook deadweight loss—not a transfer of wealth from one party to another, but a destruction of value that benefits no one.

The behavioral finance literature identifies a particularly insidious mechanism by which such investments sustain overconfidence. Investors engage in "mental accounting"—evaluating investments in separate psychological accounts rather than as components of a unified portfolio. *See* Thaler, *Mental Accounting Matters*, 12 J. Behav. Dec. Making 183 (1999). Critically, investors tend to "segregate gains and integrate losses": a winning investment is remembered as a distinct success, while losing investments are mentally bundled or attributed to external factors. *See* Lim, *Do Investors Integrate Losses and Segregate Gains?*, 79 J. Bus. 2539 (2006).

The timber transaction—even if it generated a nominal gain—thus serves a psychological function beyond its economic return. An investor whose stock portfolio exhibits the patterns documented in Sections III–V (trend-chasing, panic selling, high-cost products) can point to the timber land as evidence of investment acumen. The timber exists in a separate

mental account; it is not compared to what a timber REIT would have returned, or to the opportunity cost of capital, or to the risk-adjusted benchmark. It is simply "the real estate investment that made money." This segregated accounting sustains the belief that the investor possesses skill —a belief that justifies continued active management of the stock portfolio despite a exposed documented record of value destruction.

A decisionmaker who cosplays institutional investment in an asset class requiring professional management—and does not recognize that the hunting lease income of $10.56 per acre represents a fraction of what optimized timber operations would yield—may lack the analytical framework to recognize deadweight loss in other contexts. Worse, if the nominal gain sustains overconfidence that manifests in continued value-destroying choices elsewhere, the cognitive error compounds.

*The spanning question.* Sophisticated institutional investors evaluate new asset classes by asking whether they "expand the efficient frontier"—that is, whether they provide risk-return combinations unavailable through existing liquid investments. *See* Huberman & Kandel, *supra*. If an illiquid asset's returns can be replicated by a combination of liquid factors, the asset provides

no unique value; it is "spanned" by liquid alternatives and the investor has accepted illiquidity for nothing.

The portfolio documented herein does not reflect this framework. The disclosed holdings could have been replicated—with superior diversification, lower costs, and daily liquidity—through broad market index funds. The Grossman-Stiglitz theorem establishes that investors without informational advantages rationally free-ride on market prices through passive investment. Grossman & Stiglitz, *On the Impossibility of Informationally Efficient Markets*, 70 Am. Econ. Rev. 393 (1980). Deviations from the market portfolio represent either superior information (implausible for the reasons discussed in Section V) or uncompensated idiosyncratic risk.

*The analytical framework concern.* Petitioner does not suggest that investment acumen is a prerequisite for judicial service. Petitioner observes only that the amicus brief's arguments are written for an economically literate audience. They depend on the reader understanding that liquidity has value, that present value differs from nominal value, that voluntary transactions create surplus, and that risk-adjusted returns differ from raw returns. A decisionmaker who has demonstrated—through a decade of dis-

closed investment choices—that he does not apply these concepts to his own financial decisions may not recognize their application to the legal questions presented.

*Deference to expertise.* The pattern documented herein presents a stark contrast. On one side stands the unanimous consensus of financial economics: Nobel laureates, peer-reviewed research cited thousands of times, the arithmetic certainty that active management underperforms after costs. On the other side stands a full-service brokerage. Edward Jones has been the subject of repeated FINRA enforcement actions and state regulatory proceedings concerning suitability, disclosure, and sales practices. The firm's business model—commission-based sales of Class A mutual fund shares with front-end loads—creates structural incentives misaligned with client interests.

A judge's role requires evaluating competing expert claims and determining which to credit. The disclosures reveal a decisionmaker who, when faced with a choice between peer-reviewed academic consensus and a conflicted broker's recommendations, chose the broker—consistently, throughout the ten years of disclosures readily available on CourtListener, at

substantial personal cost. If a judge cannot critically evaluate the advice he receives in matters affecting his own financial welfare, the question arises whether similar deference to superficially authoritative but substantively flawed arguments affects his judicial decision-making.

The behavioral finance literature documents that individuals who fail to recognize their own financial errors are unlikely to recognize analogous errors in other contexts. *See* Gervais & Odean, *Learning to Be Overconfident*, 14 Rev. Fin. Stud. 1 (2001). If the government argued below that the Anti-Assignment Act serves "administrative convenience"—and this argument was accepted without scrutiny of whether the convenience outweighs the deadweight loss—the pattern documented herein may illuminate why.

## X. Disclaimer

The statements contained herein are made in the regular course of judicial proceedings and are entitled to absolute privilege. Restatement (Second) of Torts § 586 (1977); *id.* § 587 (extending privilege to parties). This filing constitutes petitioning activity protected by the First Amendment. *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510 (1972).

This filing does not constitute "investment advice" within the meaning of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-2(a)(11), because: (1) no compensation is sought or received; (2) Petitioner is not in the business of advising others as to securities; (3) the analysis is submitted to a court, not to any person for the purpose of informing investment decisions; and (4) the subject is a federal judge's historical portfolio, not a prospective investment opportunity. This filing does not constitute a "research report" under FINRA Rule 2241. Petitioner is not a registered investment adviser and is not subject to the disclosure requirements of 17 C.F.R. § 275.204-3 or SEC Form ADV.

Nothing herein should be construed as a prediction regarding the future performance of any security, fund, or investment strategy. Historical returns are presented solely as evidence bearing on judicial conduct.

Nothing herein should be construed as recommending the purchase, sale, or holding of any security. Petitioner expresses no opinion as to what steps, if any, Judge Bruggink should take regarding his portfolio composition. *Petitioner cannot offer investment advice on the docket.*

## XI. CONCLUSION

Petitioner files this notice in the interest of judicial integrity and pursuant to her understanding that the Ethics in Government Act contemplates exactly this type of litigant review. The patterns documented in Exhibits 1–10—continuous holdings in government contractors, absence of conflict-free index alternatives, active trading, high-cost products—warrant this Court's attention.

Petitioner respectfully requests that this Court consider these matters in its assessment of the proceedings below.

Respectfully submitted,


/s/ Nadja Yang

NADJA YANG, *Pro Se*

WeWork c/o Nadja Yang

115 Broadway Street, 5th Floor

New York, NY 10006

nadjay@cls.institute


February 5, 2026

CERTIFICATE OF SERVICE

I certify that on February 5, 2026, I filed this Notice Regarding Trial Court Judicial Fitness via CM/ECF, which will send notification to all registered parties.

/s/ Nadja Yang

NADJA YANG, *Pro Se*

February 5, 2026

EXHIBITS 1–10

Financial Disclosure Reports

Hon. Eric G. Bruggink

Calendar Years 2011–2020

*Attached*